Ambrose, Appellant, *v.* Western Maryland Rail-
way Company.

2

Argued May 22, 1951.   Before DREW, C. J., STERN, STEARNE, JONES, BELL, LADNER and CHIDSEY, JJ.

*A. J. White Hutton,* with him *John A. Smarsh,* for appellant.

*Paul S. Parsons* and *Edwin D. Strite,* for appellee.

OPINION BY MR. JUSTICE CHIDSEY, June 27, 1951:

The plaintiff, Helen R. Ambrose, in her capacity as administratrix, sued Western Maryland Railway Company, defendant, under the Wrongful Death and Survival Acts to recover damages resulting from the death of her husband, Robert V. Ambrose, allegedly due to the negligence of the defendant. Verdicts were rendered by a jury in favor of the plaintiff. The defendant filed a motion for a new trial which was not pressed and a motion for judgment *non obstante veredicto* which the court granted. This appeal is by the plaintiff from the entry of such judgment for defendant.

Plaintiff's decedent was an employe of the United States Letterkenny Ordnance Depot located in Franklin County close to a railroad yard of the defendant. On July 29, 1945 a number of freight cars whose contents were consigned to the Ordnance Depot were hauled from the railway yard to the Ordnance Depot on tracks

running *into the latter by a diesel engine owned by the Federal Government and operated by its employes.* On July 30, 1945, the decedent with several other men in the employ of the Ordnance Depot went to unload one of the cars belonging to the Delaware, Lackawanna and Western Railroad, and which had moved under load from Stapleton, Staten Island, New York over four railroads, the Staten Island Rapid Transit, Central Railroad of New Jersey, the Reading Company and the defendant. One of the doors of this car was opened in order to take out the shipping papers, but they could not be reached from that door and, therefore, the door on the other side of the car was opened. Both doors were sealed and the seals intact. After breaking the seals on the second door, it was opened approximately 18 inches or 2 feet. It was necessary to open the door farther to obtain the papers, and the decedent took hold of the handle on the car door and started to push it farther open. As he was doing this the door, which weighed approximately 500 or 600 pounds, fell out and onto the decedent who was so seriously injured that he died the same day. On the day before, July 29, 1945, the car was inspected by a car inspector in the employ of the defendant.

The well considered and exhaustive opinion of the learned trial judge contains a detailed review of the evidence not disputed by appellant or appellee which we quote: "The uncontradicted evidence in the case is: The car was a wooden box car. The door was a corrugated iron door which had rollers at the bottom. The rollers operated on an iron track or a bar attached to the car and the door was held in place by curved irons which hooked under and up around the lower track. At the upper part of the door was a Z-bar attached to the car which formed a groove or channel about one and a half inches deep and one and a half inches wide in which the door was supposed to slide.

The Z-bar was to keep the door from falling outwards, and the door had several small guides of iron which rode on the outside of the Z-bar, preventing the door from falling in and rubbing against the main structure of the car. At the side where the door closed there was about a two inch vertical flange or angle on the door post, the full height of the door opening, which came out at right angles to the car and then turned at right angles and ran parallel to the car an inch to an inch and a half out from it. This formed an offset or groove the full height of the door, known as a cinder guard or spark arrestor, because it prevented any sparks or cinders from entering the car, when the door was closed. The door fitted into this offset when closed and was held in place by a door lock which was sealed with the ordinary railroad seal. The door guides and tracks along the side of the car, beginning at the door post at which the door closed, extended and ran, respectively, along above and below the door opening and past it to the door stop on the car, which prevented the door from sliding beyond the tracks when opened, a distance of 12 feet, 5⅛ inches. The width of the door was 6 feet 2¾ inches. The distance from the top of the bottom rail, on which the door rollers rested, to the bottom of the upper guide or Z-bar behind which the door was supposed to slide, was slightly different at different places as the upper rail, for some distance, was bent up from ⅛ of an inch to a maximum of ¼ of an inch and the lower rail at the rear door post was bent down or dented approximately ¼ of an inch. We refer to the front door post as the door post on which the spark arrestor or cinder guard was placed, against which the door closed and the rear door post as the door post at the opposite side of the door opening. The plaintiff's witnesses measured the size of the door and also the distance between the lower rail on which the door rollers ran and the lower part of the upper guide, that is, the open-

ing which existed between the lower edge of the guide or Z-bar at the top of the door and the track on which the door rollers ran. These measurements seem to have been very accurately made by the witnesses for the plaintiff, one of whom was a civil engineer. They are as follows: at the front door post, 8 feet, 7 inches, then at intervals of one foot measured from the front door post toward the door stops; at one foot the opening was 8 feet, $7\frac{1}{8}$ inches; at two feet—8 feet, 7-3/16 inches; at three feet—8 feet, 7-3/16 inches; at four feet—8 feet, $7\frac{1}{8}$ inches; at five feet—8 feet, 7-3/16 inches; at six feet—8 feet, $7\frac{1}{4}$ inches; at seven feet— 8 feet, 7 inches; at eight feet—8 feet, $6\frac{7}{8}$ inches; at nine feet—8 feet, $6\frac{3}{4}$ inches. It will be noticed that these measurements covered the space occupied by the door when closed up to a point where it was opened approximately three feet. The uncontradicted evidence in the case was that the door was opened approximately eighteen inches to two feet when the decedent started to push it farther back and it fell, therefore, these dimensions cover the location of the door at the time it fell. The door was also measured by the same persons called by the plaintiff, and they stated that on the side which fitted into the spark arrestor or cinder guard, it measured from the bottom of rollers to the top of the door 8 feet, 7 inches and at the opposite side 8 feet, $7\frac{1}{8}$ inches, a difference of $\frac{1}{8}$ of an inch. The witnesses for the defense who measured the opening between the track on which the door rollers ran and the bottom of the Z-bar made two measurements, one at the front door post and one at the rear door post, and stated that both of these measurements were 103 inches or 8 feet, 7 inches. They measured the door and stated that it measured on both sides 103 inches or 8 feet, 7 inches. One of them testified that the lower rail or bar was bent down about a quarter of an inch at the rear door

post[1] and that the top door rail was bent up from the back door post for a distance of three feet to the center of the door, ¼ of an inch. . . . It was also testified that the top edge of the door was slightly rubbed and not the upper part of the front side, which indicated that the top of the door was rubbing against the bottom of the upper rail or Z-bar. It is clear that when the door was in place, closed and locked, the front side of the door was held in place along its entire height by the cinder guard or spark arrestor on the front door post. It will be noticed that the height of the door was less than the opening between the track on which the rollers ran and the lower part of the upper guide or Z-bar from ⅛ to ¼ of an inch, this discrepancy varying across its width of 6 feet, 2¾ inches, except that at the front door post the door height and the opening were the same. There was testimony that standing on the ground, *with the door off,* and looking up at the upper guide, one could notice that the upper guide was bent upward. There was also testimony that *with the door in place on the car,* any slight opening between the top of the door and the lower edge of the upper guide or Z-bar could not be seen by a person standing on the ground, close to the car, as the top corrugation on the door was very close to the lower edge of the Z-bar and that 'this door rail would not have been detected bent under ordinary inspection by any inspector.' *There was no testimony in the case that, when the door was closed, a person standing on the ground could see and recognize the fact that the upper part of the door was not behind the outside portion of the upper guide or Z-bar.* The door was not replaced on the car immediately or shortly after the accident with the upper and lower door rails or guides as they

[1] The opinion of the lower court conclusively demonstrates that this bent condition of the lower rail or bar was neither the cause nor a contributing cause of the accident.

were when the door fell off. There was testimony that the door was replaced some days later, August 11th, in the repair shop of the D.L. & W. R.R., without anything being done to either the upper or lower guides and that it operated satisfactorily." (Emphasis supplied).

As stated by the learned trial judge, it is evident that there is no real discrepancy in the testimony of the witnesses for the plaintiff and the defendant as to the measurements of the door and the door opening. And as also stated by him, after giving the benefit of every inference reasonably deduced from the evidence with its conflict resolved in plaintiff's favor, (*Phillips v. Philadelphia Transportation Company*, 358 Pa. 265, 56 A. 2d 225; *Carter v. Pittsburgh Railways Company*, 327 Pa. 586, 194 A. 900; *Bockstoce v. Pittsburgh Rwys. Co.*, 159 Pa. Superior Ct. 237, 48 A. 2d 126) it must be assumed that the decedent's death was caused by the fact that, on the freight car in question, the distance between the rail on which the door's rollers rested and the bottom of the upper guide or Z-bar was, for a distance, greater than the height of the car door, and that, because of this defective set-up, when the decedent pushed the door back in a proper manner and without any negligence on his part, the door fell outward from the car, throwing him to the ground and falling on him.

The sole question posed is, therefore, whether thus considering the testimony most favorably to the plaintiff, the evidence justified a finding that negligence on the part of the defendant was the proximate cause of the decedent's death. The answer lies in the degree of care owed by the defendant to the plaintiff as an employe of the consignee Ordnance Depot. It was the duty of the defendant to make a reasonable inspection of the car before delivery to the consignee. Was there a reasonable inspection? Under our cases and those of a majority of other jurisdictions, it is settled that a railroad company before delivering a loaded car received

from a connecting carrier to a consignee must make an inspection thereof sufficiently thorough to ascertain whether there is any *fairly obvious defect* in its construction or state of repair which constitutes a likely source of danger: *Dominices v. Monongahela Connecting Railroad Company,* 328 Pa. 203, 195 A. 747; *Maternia v. Pennsylvania Railroad Company,* 358 Pa. 149, 56 A. 2d 233; *Semensky v. Pennsylvania Railroad Company,* 156 Pa. Superior Ct. 555, 41 A. 2d 217; 126 A.L.R., p. 1095. There was ample uncontradicted evidence to show conclusively that the customary method used by railroads in inspecting cars was by an inspection from the ground, the inspector walking around the car and looking at the running gear, brake rigging and visual inspection of the body of the car and its doors. The inspection made by defendant's inspector was in conformity with this standard. In the instant case, uncontroverted measurements demonstrated that when the door was shut and in place practically against the side of the car, the closing edge being in the cinder guard or spark arrestor, it was practically impossible for a person standing on the ground beside the car, looking at the door for defects, to see and recognize that the door for a distance was from ⅛ to ¼ of an inch shorter than the space which it occupied. Especially was this true as the uppermost corrugation was close to the upper guide or flange which was approximately 6 feet above the head of a person 6 feet in height. As stated by the learned trial judge, only by an examination made from the top of the car or from a ladder placed on the ground which would enable an inspector's eyes to be on a level with such condition, or by opening the door, would such condition be apparent. There was no testimony that the door sagged or bulged in any way and, in fact, the uncontradicted testimony showed that, when unlocked, and the seals removed, the door slid back 18 inches or 2 feet in a normal manner.

In *Pass v. Gulf, C. & S. F. Ry. Co.*, 83 S.W. 2d 729 (Texas), which was an action against the railroad company by the consignee by reason of a defective door hanger breaking off and falling on the employe's head, the court, in affirming judgment for defendant, states, "It is not controverted that all railroads, handling said car from the time it was loaded until set out on the consignee's industry track at Temple, furnished competent and experienced inspectors. While appellants insist that the evidence does not show that such inspectors inspected this particular car en route, since appellants charged only the Gulf, Colorado & Santa Fe with negligence, its liability must depend upon whether it discharged its duty in the premises. When trains were inspected, record was made by the inspector only of cars which were found to be defective, and the records of inspection of trains in which this car moved from the time it was loaded at Fort Worth to the time it was spotted for unloading at Temple, failed to show any defects discovered in the car. It is not controverted that inspections were made at Fort Worth, at Cleburne, and at Temple of the train which included the car in question; that same were made by competent and experienced inspectors under proper rules, regulations, and supervision of the railway company; and that same were made in the usual and customary manner. And we think it was clearly established that such inspections were made as carefully as the exigencies of the traffic would permit. The record also discloses, without substantial controversy, that the defect in question was a hidden defect. It consisted of an old break or crack on the inside of the hanger arm of the car door. This was not visible from an outside inspection except for a *small fractional part of an inch on one edge of the hanger bar where the break extended through to the outer edge.* As to doors, the inspection was made from the ground, and the hanger was just beneath the roof

of the car, some five or six feet above the inspector's head. All those qualified to testify on the subject, after an inspection of the broken hanger arm which fell upon Pass, and the old break therein, testified that the defect could not have been discovered *except by a minute and very close inspection;* and some witnesses testified that it could have been detected *only by opening the door of the car* and examining the hangers from the inside. This being a foreign car and under seal, the employees of appellant [R. R.] were neither authorized nor required to make any such inspection in the discharge of their duties." (Emphasis supplied)

In the instant case there was testimony that the car had been inspected by three other connecting carriers before it reached the defendant's lines and no defective condition was discovered. We are of the opinion that any defects in the car door mechanism which caused it to fall upon the plaintiff's decedent were not fairly obvious upon a reasonable inspection performed by a competent inspector, but were defects which could only be discovered and recognized as a likely source of danger by an inspection so minute and made in such a manner as to place an unreasonable burden on a connecting carrier receiving the car loaded and sealed. There was no defect that was ascertainable by a reasonable inspection *so that indeed it was immaterial whether or not the appellee made any inspection at all.* This is a complete answer to appellant's contention that the character of the inspection made rested upon oral testimony which was for the jury.

In *Copeland v. Chicago, B. & Q. R. Co.,* 293 Fed. 12, at page 16 the court said: "The record does not show whether either defendant did inspect or did not inspect the car. After the car was loaded at Indianapolis, and the doors closed and fastened to the post which stood under and in contact with the plate that fell, we think the defect complained of was, as to connecting and de-

livering carriers, a latent and hidden one, that under the facts there was nothing that would call attention to or suggest that the nuts were off of the bolts, and that no reasonably careful inspection of the car would have discovered that they were off. To hold on the facts that the defendants were required to open and enter this loaded car while it was in their possession and take such steps as would have led to a discovery that the nuts were off of the bolts, would require of them not a reasonable but an unreasonable inspection, a minute and detailed examination, made upon a vague guess that an inside inspection might perchance, if carried far enough, develop something, hidden though it be and the existence of which there was no cause to suspect, that could be repaired."

Neither the doctrine of *res ipsa loquitur* nor of exclusive control urged by appellant is applicable here. As stated in *Sierocinski v. E. I. DuPont de Nemours & Co.,* 118 F. 2d 531 (C.C.A. 3rd) at p. 535: "The rule of *res ipsa loquitur* has been limited in its application by the courts of Pennsylvania to cases involving injury to passengers through the transportation operations of common carriers or to patrons of utilities dispensing a service which, if not properly managed and controlled, may readily prove dangerous."

The doctrine of exclusive control permits an inference of negligence when defendant is in exclusive control of the instrumentality causing the injury: *Commonwealth v. Montour Transport Company,* 365 Pa. 72, 73 A. 2d 659. This doctrine and its inapplicability unless there is exclusive control by the defendant is well illustrated in *Semensky v. Pennsylvania Railroad Company,* supra. There the accident occurred on the property of the shipper, where an empty car had been delivered by the railroad for loading two days before. When the car was loaded, the plaintiff, an employe of the shipper, got up on the car, released the brake,

and proceeded to ride the car down the spur track, which was on an incline. When he tried to apply the brakes, they failed, causing the car to collide with a truck, which resulted in the plaintiff's injuries. The court, affirming a judgment *non obstante veredicto* for the defendant said at page 559: "Plaintiff attempts to justify his verdict by invoking the principle that where the instrumentality which causes the injury is shown to be under the control and management of defendant, and if the accident is one which ordinarily would not occur if those having the management use proper care, it affords reasonable evidence, in the absence of explanation by the defendant, that the accident arose from a want of care. This principle is not applicable where the defendant has not exclusive control of the injury-causing device at the time of the accident."

Here appellee was not in control of the freight car at the time of the accident, it having been delivered to the Ordnance Depot the day before. Appellee was not the owner of the car and its only duty of care with respect to the plaintiff's decedent was to deliver the car to the latter's employer, the Ordnance Depot, free of defects fairly obvious upon a reasonable inspection. The plaintiff failed to establish that decedent's death was due to a failure by defendant to perform all that was required of it in this regard.

Judgment affirmed.

Mr. Justice LADNER dissents.