RUCKTENWALD, by Guardian *ad litem*, and another, Appellants, vs. CHICAGO, MILWAUKEE, ST. PAUL & PACIFIC RAILROAD COMPANY, Respondent.

*May 5—June 3, 1952.*

612

*Arlo McKinnon* of Milwaukee, for the appellants.

For the respondent there was a brief by *Bender, Trump, McIntyre, Trimborn & Godfrey,* attorneys, and *Rodger S. Trump* of counsel, all of Milwaukee, and oral argument by *Rodger S. Trump.*

FRITZ, C. J.   On the trial of the action the evidence established the following facts.   Shortly before noon on

July 18, 1944, one of the defendant's "battleship" type hopper freight cars loaded with sand was hauled by the defendant on its track to the top of the Pipkorn Company's trestle which was twenty-five feet above the ground. The car was "spotted" there by defendant for Pipkorn to unload the sand through the car hoppers down through grilles between the railway track into Pipkorn's bins beneath its trestle, from which it loaded sand onto its trucks. Pursuant to Pipkorn's instructions such cars were unloaded in the following manner. The car was spotted by defendant in an east-west direction on the trestle, and the north half was unloaded by Pipkorn's employees first opening the hoppers on the north half of the car and then striking the north side of the car with sledge hammers to loosen the sand, and then entering the car and working with shovels to move all the sand in the north half of the car down through the car hoppers. After the north half was unloaded, the sand in the south half of the car was likewise loosened by striking the south side of the car with sledge hammers and then working the sand with shovels down through the car hoppers. The reason for Pipkorn unloading the north half of the car first was that the bins sloped to the south so that unless the north half of the car was unloaded first the sand would block the egress of the sand from the north half.

Prior to July 18, 1944, no car, so unloaded on the trestle, had ever tipped over. On said day, the car involved in this action was "spotted" on the trestle shortly before noon. The plaintiff, Leonard Rucktenwald, aged fifteen, and two other teen-age boys, Joseph Fricano and Clarence Schwalbach, Jr., had been employed by Pipkorn since the end of school in June to unload such cars. They commenced unloading the car in question soon after it was safely "spotted" by defendant. Following Pipkorn's instructions they first unloaded the north half of the car completely, but the south half was still fully loaded. The sand was damp and heavy and stuck to

the sides of the car and to move it required tapping the side of the car and the use of shovels. After an hour off for lunch the three boys returned to the car and went up on the sand at the south side of the car. Fricano left to get a drink of water. When he returned to the car Rucktenwald was standing on the sand on the southeast end of the car; Schwalbach was on the southwest end; and when Fricano climbed up the ladder on the southeast corner of the car and reached the top and was standing on the sand with the other two boys, the car without any warning tipped over to the south, throwing the boys twenty-five feet to the ground below the trestle. Fricano testified: "I just climbed up into the car, got over the edge, and I saw the north side of the car going up. I thought I was falling forward. That's the last I remember."

After the car tipped over, the wheel trucks of the car on the west end were found to be standing on the rails, and the trucks on the east end were up and still attached to the bottom of the car. A center pin,—eighteen inches long and one and three-quarter inches thick,—was missing from the west-end trucks and car body. Ordinarily this pin would have been in a hole or socket on the top surface of the trucks in a loose fit to a depth of about seven inches, with the remaining eleven inches of the center pin fitting into a hole or socket in the body of the car. A careful search for the pin was made, but it was never found. A side bearing also was missing from the west-end trucks, and after a day's search, it was found and put back in place. Norman Pipkorn testified it could not be stated from which end of the west trucks this bearing came. Ernst Palmer, defendant's general car foreman, testified that it came from the "BL" end of the car, which is the west end on the left or north side of the trucks. The side bearings on the east end of the car were also out of their places, but were found between the car body and the trucks. The east-end center pin was in its place but was bent.

After defendant "spotted" the car on the trestle, it did not have any control of the car or the management of the unloading thereof; or do anything causing the injury. Pipkorn and its employees had the exclusive possession and control of the unloading process itself, and also of the trestle and the land on which the car was located. But plaintiffs claim the only rational explanation for the car tipping over was negligence of the defendant in providing a defective car.

Defendant contends that, as testified by its assistant superintendent, Vernon Green, the car tipped over because the center of gravity was shifted to a point beyond the south rail.

Jobe B. Johnson,—a senior engineer employed by the Travelers Insurance Company,—testified:

A car which tips has lost its balance because the center of gravity has moved beyond the permissible. If the balance has gone beyond the permissible, it can be upset by a very small additional weight. . . . The thing that determines the balance of a railroad car is the center of gravity. You must have a center of gravity on anything like that.

Johnson testified on cross-examination:

"Q. . . . Mr. Johnson, if the center of gravity of any railroad car is outside the center line of the rail, that car is bound by engineering facts to turn over, is that correct? A. If the center of gravity is outside of the center line of the support, it will.

"Q. And in this case the support is the rail? A. The final support, yes.

"Q. And that is true regardless of any mechanical defect? A. Any mechanical defect to the contrary notwithstanding, if you have the center of gravity outside of that perpendicular line, it will tend to move in that direction."

There was no evidence contrary to Johnson's testimony.

At the conclusion of the introduction of evidence on the trial, Judge BREIDENBACH denied defendant's motion for a directed verdict.

He then stated: "I shall submit it to the jury, reserving the question for further argument after the verdict, the question relating to the defective condition of the spring under the bolster plate and the side bearings above the bolster plate;" and he then read seven questions for his proposed special verdict. Thereupon, after some discussion by the court and the attorneys for the respective parties, plaintiffs' attorney stated: "I would suggest, rather than splitting up that part of the verdict: 'Was there a defect in that car which caused the bolster plate to lower?' "

The court stated: "I have limited the inquiry of the jury to the springs and have stated it that way."

Plaintiffs' requested special verdict questions were submitted.

The court stated: "I note you tied up the fourth question with one, two, and three."

Defendant's attorney stated: "I would like to make one comment on these questions. As to the first one—was it a defective condition with respect to its springs? That's a little too general. It ought to be the springs, first, on the 'B' end of the car, the truck on the 'B' end of the car and on the right truck because, as the plaintiffs' expert witness testified, it would have to be something pertaining to this down spring over here. He pointed this particular item out time and again. That is the spring we are concerned with here."

Plaintiffs' attorney replied: "I would go along with Mr. Trump on the first part of his objection, if he wants to particularize the springs in question to the springs on the 'B' end of the car, that I think is all right. I do think though it would be a mistake to limit them to the 'BR' side of the car, as Mr. Trump suggests, because Mr. Johnson did specifically testify the defect could be a hung spring on the 'BL' side of the car."

The court finally stated: "Let's insert: 'Prior to and at the time the defendant's railway car tipped, was it in a defective condition with respect to its springs at the "B"

end of the car?' " None of the parties objected to the question in that form.

Under the form of the questions thus submitted without any further objection, the jury answered that first question, "No;" and because of that finding the jury was not required to answer the second, third, and fourth questions. And likewise the jury was to answer the fifth and sixth questions only if the fourth question was answered, "Yes." Consequently, as the jury found in answer to question number one that at the time the car tipped it was not in a defective condition with respect to its springs at the "B" end of the car, the plaintiffs were not entitled to recover.

As prior to the accident the defendant had completed placing the car in question safely on Pipkorn's trestle, and it was thereupon solely under the control and management of Pipkorn, which then had the exclusive possession and control of the car and the unloading process and the trestle and land on which it was located, the doctrine of *res ipsa loquitur* is not applicable.

As stated in *Ashton v. Chicago & N. W. R. Co.* 198 Wis. 618, 623, 225 N. W. 328:

"While some of the earlier cases approve the doctrine that the mere happening of an accident or the sustaining of a loss on a railway raises a presumption of negligence, 'this doctrine is now abandoned, and it is quite universally held that the evidence must go further, and tend in some tangible way to show that the accident resulted from something connected with the operation of the railway.' *Spencer v. C., M. & St. P. R. Co.* 105 Wis. 311, 314, 81 N. W. 407.

"It is only when the agency or the thing causing the injury or the loss is under the control and management of the defendant that the doctrine of *res ipsa loquitur* applies. *Stimson v. M., L. S. & W. R. Co.* 75 Wis. 381, 383, 44 N. W. 748; *Cummings v. National F. Co.* 60 Wis. 603, 612, 18 N. W. 742, 20 N. W. 665. Under the provisions

of the uniform bill of lading both of the cars on the siding were under the protection and at the risk of the shippers who had ordered them. Until they were attached to a train or a locomotive, they did not pass under the control and management of the defendant."

In *Ambrose v. Western Maryland R. Co.* 368 Pa. 1, 81 Atl. (2d) 895, the defendant railroad company delivered a loaded car to an ordnance depot. The car had been delivered with the seal intact and it was the employees of the consignee who broke that seal. A car door fell off while plaintiff and fellow employees were attempting to get it open. The court specifically held that the doctrine of *res ipsa loquitur* and the doctrine of "exclusive control" were not applicable because the railroad was not in control of the freight car at the time of the accident. The court said (p. 11):

"The doctrine of exclusive control permits an inference of negligence when defendant is in exclusive control of the instrumentality causing the injury. . . . This doctrine and its inapplicability unless there is exclusive control by the defendant is well illustrated in *Semensky v. Pennsylvania R. Co.* [156 Pa. Super. 555, 41 Atl. (2d) 217.]" See also *Martin v. Southern Pac. Co.* (D. C.), 46 Fed. Supp. 954.

In the case at bar the car, including the unloading thereof, was in the exclusive control of Pipkorn at the time of the accident. In answer to the questions for a special verdict submitted with the approval of the attorneys for all parties, the jury found that prior to and at the time of the accident the car was not in a defective condition with respect to its springs at the "B" end of the car; and because of this finding the jury was not required to answer the other questions in the verdict.

On the other hand, there was the undisputed evidence that the car tipped over when Schwalbach was in the southwest half of the car, Rucktenwald was on the southeast half, and

Fricano climbed up to the southeast corner and just got over the edge of the car and saw the north side of the car going up and he thought he was falling forward. The evidence in that respect and the uncontroverted testimony that a car which tips has lost its balance because the center of gravity has moved beyond the permissible and can be upset by a very small additional weight, warranted the conclusions that the car tipped over because it lost its balance and that it could lose its balance regardless of any mechanical defect.

*By the Court.*—Judgment affirmed.