## Court *v.* Pittsburgh and Lake Erie Railroad Company, Appellant.

Argued March 26, 1963. Before BELL, C. J., MUS-MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*Gordon E. Neuenschwander,* for appellants.

*Marvin D. Power,* with him *Michael A. Barletta,* and *Suto, Power, Goldstein & Walsh,* for appellee.

OPINION BY MR. JUSTICE MUSMANNO, April 16, 1963:

No matter how stereotyped and individualistic a freight car might seem as it clatters by in a long railroad train, it has characteristics all its own and it develops a precise history which is recorded in the books of the various railroads over which it roams. The car involved in the accident in this case was No. 362807, gondola type. Owned by the Pennsylvania Railroad Company, it began on October 31, 1958, a journey (one of the results of which became the subject of litigation) at the United States Steel Company plant in Fairless Hills, from which point it proceeded on Penn-

sylvania Railroad tracks to Homestead, where it interchanged to the Pittsburgh & Lake Erie Railroad, rolling over the P. & L.E. right of way to McKees Rocks, and then to Beaver Falls, where it remained for two days. It took to the road again on November 10th and advanced to a point 11 miles from Ellwood City. Here it was switched to the tracks of the Baltimore & Ohio Railroad, and eventually arrived at the destination of the cargo it carried, the plant of the Garrett Company in Ellwood City. The cargo consisted of 101,810 pounds of hot roll steel. On the morning of November 11th, Anthony Court, employee of the Garrett Company, (the plaintiff in this lawsuit), unloaded the steel, employing a crane and slings in the process. On that same afternoon he took up the job of loading the same car with scrap steel. While engaged in this operation, standing within the walls of the gondola, the end gate, which weighed 1500 pounds, fell into the car crushing his left leg. Amputation below the knee followed.

Anthony Court brought an action of trespass against the Pennsylvania Railroad, the United States Steel Corporation, and the Pittsburgh and Lake Erie Railroad. The P. & L.E. joined the George K. Garrett Company as an additional defendant. Later, the plaintiff filed a separate suit against the Baltimore & Ohio Railroad. At the trial, the court entered nonsuits in favor of the Pennsylvania Railroad and the United States Steel Corporation.

The jury returned a verdict in the amount of $75,-000 against the P. & L.E., the B. & O., and the Garrett Company. The verdict was molded by the court to provide that the lien, discharge and satisfaction of any judgment entered upon the verdict should conform to the provisions of the Pennsylvania Workmen's Compensation Act. Both railroad companies appealed, seeking judgment n.o.v., or, in the alternative, a new trial.

The appellants contend that the journey of the involved gondola had terminated when the steel it carried was delivered to the Garrett Company and that, therefore, what happened after that delivery was irrelevant to the case, and if this proposition is not accepted, the appellants are entitled to n.o.v. on the basis that the plaintiff failed to make out a case of negligence against either railroad defendant.

The business of a railroad company engaged in the freight business is to supply cars and motive power for those cars. The business of the Garrett Company (so far as this litigation is concerned) was to receive cargo and send out cargo.

Charles J. Smith, railroad agent of the P. & L.E., whose job was to solicit freight, testified that Angelo Court, an employee of the Garrett Company (brother of the plaintiff), called him on the day of the accident and asked him for an empty car, and that he, Smith, directed Court to "use the car that had come in", that is, the fateful gondola 362807. The lower court said on this point: "No report of the condition of the car was made by Garrett Co., to the P. & L.E. The P. & L.E. made no inquiry as to what the condition of the empty car was before it told Garrett Co. to go ahead and load it. The testimony clearly proved that the P. & L.E. knew that it was the practice of Garrett Co. to load and unload freight cars in its plant. The loading of freight cars by Garrett Co. in its plant was certainly, under the evidence, obviously related to the principal business of Garrett Co. We therefore conclude that the duty of the railroad companies to furnish a car to Garrett Co. in a safe condition extended to the loading of the car as well as to the unloading of it."

Since the P. & L.E. agent directed Garrett to use Car 362807, it was incumbent upon him, acting for the railroad company, to make some diligent effort to as-

certain whether the car was in condition to perform the work intended for it by Garrett. Section 392 of the Restatement of Torts provides: "One who supplies to another, directly or through a third person, a chattel to be used for the supplier's business purposes is subject to liability to those for whose use the chattel is supplied, or to those whom he should expect to be in the vicinity of its probable use, for bodily harm caused by the use of the chattel in the manner for which and by persons for whose use the chattel is supplied: (a) If the supplier has failed to exercise reasonable care to make the chattel safe for the use for which it is supplied."

Did the P. & L.E., and the B. & O. exercise reasonable care to make car 362807 safe for the use to which it was to be put by Garrett? Did the railroad companies know that there was anything wrong with the car?

The appellants argue that they could not foresee that the car would be used for reloading, but when they authorized the reloading they impliedly assured Garrett that the car was fit for reloading. If an ocean-going ship sinks on its outward trip because of a hole in the hull, the ship owner cannot be expected to be relieved of liability by answering that there was no hole in the vessel when it unloaded its incoming passengers.

The appellants quote from the case of *Dominices v. Monongahela Connecting R.R. Co.*, 328 Pa. 203, as follows: "What is the theory upon which liability ordinarily is imposed upon a railroad company if it delivers a defective car to be unloaded? Apparently, the carrier is regarded as representing to the consignee: 'We are supplying this car (either owned by us or temporarily procured from a connecting carrier or from a private owner) and, as such supplier, we have made a reasonable inspection to enable us to assure

you that the car is safe for you and your employees to enter for the purpose of removing your merchandise."

The appellants do not quote enough. Justice STERN (later Chief Justice), who wrote the opinion, said, following what was just quoted: "This implied assurance is the more necessary because the consignee himself is not obliged to make an inspection of the car before his employees unload it. [citing cases] Thus, under usual circumstances, the consignee and his employees are entitled to rely upon the performance by the carrier of the duty of inspection."

The *Dominices* case, however, is not authority for the position of the defendants in any event because the shipment in that case was from one plant of the Jones & Laughlin Corporation, where the plaintiff was employed, to another plant of the same company. Moreover, the Jones and Laughlin Corporation not only knew of the defective condition of the car there involved, but had actually created it, and the defendant railroad company delivered it to the Jones and Laughlin Corporation as consignee in the same condition in which it had received it from Jones and Laughlin as consignor. As Justice STERN said, "under such circumstances defendant should not be held liable for failure to have discovered the defect and to have warned the consignee's employees of danger." Another reason why the *Dominices* case does not apply to the case at bar is that there was no reloading in that case as there was here.

The appellants suggest the possibility that the defect in car 362807, if there was one, may have come about as a result of the unloading process at Ellwood City or that it may have been damaged in some way during the interval (23 hours) between the arrival and the loading. But there is no evidence that the car was damaged either in the unloading or prior to the reloading.

Thus, if the railroad company was responsible for the condition of the car when it arrived at Ellwood City, which it was, and there was evidence, as we shall presently see, that it was in a damaged condition before it arrived at Ellwood City, and there was no evidence that it had been damaged during the 23-hour layover at Ellwood City, it was proper for the jury to determine if the condition, which finally caused the endgate to fall on the plaintiff, was the result of the lack of proper inspection on the part of the railroad company prior to the unloading.

It was fairly well proved by a studied inspection of the car after the accident that the endgate fell because it had not been properly anchored. The gate moved on hinges at its bottom and was held upright by latches which secured it to what was known as "end posts." At the point where the gate was to fasten to the walls of the car, the sides of the car had bulged, making contact between the sides of the gates and the sides of the car impossible or ineffectual. A door that does not fit snugly into its frame and cannot be attached to the frame cannot obviously be permanently held in place. Especially is this true when the hinges of the door are at the bottom, instead of at the side.

If this bulging condition existed prior to the car's arrival at Ellwood City, and the railroad company did not conduct the type of examination which the rules of safety dictated, a jury could find that the railroad carrier had failed to discharge its obligations to the plaintiff and would be responsible for whatever damage befell him because of the inadequate or improper inspection.

Crawford Walters, inspector for the P. & L.E., testified that he inspected the car when it was temporarily immobilized at College, a place eight miles from Ellwood City. The inspection was made the morning of November 10th before daylight could take him by the

hand and guide him to danger spots. He used a hand electric lamp whose rays barely reached the top of the car. He said that he saw no defect which should have caused him to rate the car unsafe. He noticed the bulging of the car but he explained: "I didn't think it was out far enough to take exceptions." The bulge of a railroad car at the point where it must hold in place a massive barrier weighing 1500 pounds is not an insignificant matter any more than the smallest hole in the hull of a vessel can be regarded unimportant. Walters did not climb the ladder of the car to look into it, he did not test any brake or apparatus of the car. His test consisted merely of walking on either side of the car and cursorily looking it over, as one might examine a race horse by walking around it to make certain it had four legs. Whether this type of examination conducted by Crawford Walters, or anyone else on behalf of the railroads, measured up to the standards of safety required in circumstances of this case was a question of fact for the jury.

The appellants argue (still citing *Dominices,* supra, and, in addition, *Ambrose v. Western Maryland R. Co.,* 368 Pa. 1), that the duty of making inspections "is clearly qualified to be one for defects that are fairly obvious upon reasonable inspection." Whether the localized swelling of car 362807 was of such a character as to be "fairly obvious upon reasonable inspection" was for the jury to determine and we cannot say that the jury erred in finding that the metallic obesity was "fairly obvious." Three or four of the Garrett employees testified to seeing the bulging although their scope of knowledge of railroad equipment was not such as to inform them of the significance of the unusual convexity in connection with the latching of the endgate.

The appellants cite the case of *West Jersey & S.R. Co. v. Cochran,* 266 Fed. 609, which comprised an un-

loading process, and the railroad was absolved from responsibility for the accident reported therein. However, in that case, the reloading was strictly an intramill operation, and did not involve the continued surveillance of the railroad carrier. In the case at hand, the car was being loaded for further transportation by the railroad carrier. The P. & L.E. and the B. & O. at no time uncoupled the train of responsibility by which they were continuously attached to the itinerant, swollen gondola No. 362807.

The defendants' motion for judgment n.o.v. was properly refused.

The appellants, in seeking a new trial, complain because the trial court refused to affirm the point which read: "If you find that at the time it turned over this car to Garrett Co., the defendant, the Baltimore and Ohio Railroad Company, was acting for itself and not as agent for the defendant, the Pittsburgh and Lake Erie Railroad Company, then you must give a verdict in favor of the Pittsburgh and Lake Erie Railroad Company."

The court was justified in rejecting the point for the reason it gave, namely: "While there was an issue of fact in this case as to whether or not the B. & O. was an agent for the P.&L.E. this issue was submitted by the trial court to the jury under proper instructions. A determination, however, by the jury that there was no agency relationship between the B. & O. and the P. & L.E. would not in itself insulate or relieve the P. & L.E. from liability unless there were a further finding that the P. & L.E. was not negligent or it were negligent that its negligence was not a proximate cause of the injuries."

The Court also properly concluded that: "The jury has found by its verdict that all three defendants were negligent and that the negligence of each one operated concurrently in producing the plaintiff's injuries."

The appellants contend that they are entitled to a new trial on the basis that the verdict was contrary to law and against the weight of the evidence. A thorough examination of the record reveals no substantiation for this contention.

Finally the defendants ask for a new trial on the ground that the verdict was excessive. The expenses incurred by the plaintiff include $1,079 for hospital services, $948 for medical services, $462 for nurses, $22 for medicine. His artificial limb cost him $430, and the cost for maintaining and renewing the prosthesis will amount to $5,425. He lost wages in the amount of $2,215. His total out-of-pocket expenses thus amount to over $10,000. The verdict was for $75,000. His life expectancy, according to the court below, is 40.3 years. If the difference between $75,000 and $10,000, were to be transformed into ten dollar bills, there would of course be a considerable accumulation of greenbacks, but if they were to be spread over the highway of forty years, one would find long bleak, arid stretches of chronology unrelieved by the presence of life-sustaining verdure.

Anthony Court made his living with his hands and feet. His school education was limited to the primary grades. A man who has been denied a college or even a secondary education and has only one full leg to support him, is bound to find it more difficult to earn a comportable living than one who does not need his legs to operate the treadmill of economic life in order to obtain food, shelter, raiment and the other necessities, with an occasional luxury which, in this era of tension, trouble, trepidation and terrestrial turmoil, has periodically become a necessity.

Nor is the need for a man's undisabled limbs restricted to the employment of them in gathering the sheaves of wheat for bread on the table. Healthy exercise, wholesome games, outdoor diversion are as essen-

tial to one's well-being as milk and orange juice in a glass. Anthony Court was an enthusiastic baseball player. He even played professional baseball. This sport, or any other which requires pedal exertion, is now no longer his to enjoy. In addition, he has been subject to considerable pain and suffering which apparently has not ceased. He testified: "When I come from work I got to take my leg off because I get them pains and I can't stand it, and I have to have it off for twenty minutes and put it in hot water and rub it with alcohol every twenty minutes."

He testified that blisters form on the stump of his leg when he walks.

The amount of the verdict did not shock the conscience of the court below, nor does it ours.

Judgments affirmed.