## Campbell v. New York Central Railroad Corporation

Before Evans, P. J., Laub and Rossiter, JJ.

*John A. Blackmore*, for plaintiff.

*Gifford, Graham, MacDonald & Illig*, and *Curtze, Gent & McCullough*, for defendants.

LAUB, J., February 19, 1965.—This is an action in trespass for injuries sustained by plaintiff when the endgate of a gondola railroad car fell inward and struck his heel. At the close of plaintiff's evidence, defendants moved for a compulsory nonsuit. The motion was granted and the nonsuit was entered. Plaintiff has moved to take it off, and this is why we are reviewing the matter at this time.

There was little or no dispute over the facts presented by plaintiff. As shown by the record, plaintiff's employer, the Great Lakes Scrap Yard, ordered a carload of scrap metal from defendant, Luria Brothers, in Cleveland, Ohio. The scrap was loaded on a gondola railroad car and shipped over the New York Central lines to the Great Lakes Company in Erie where the

car was spotted inside the scrapyard. It was then moved by the Great Lakes employes to another portion of the yard where it was to be unloaded. From the time it was delivered to the scrapyard until four days after the accident in question, the car was in the possession of the Great Lakes Company.

On the morning of the accident, plaintiff, who was the signal man for the crane operators of the scrapyard, assisted in a partial unloading of the car's contents, said contents being huge pieces of broken machinery. The car was headed in an east-west direction with the crane being located to the east of the car on the same railroad tracks. Plaintiff and the crane operator proceeded to unload the car on its east end, and while this was taking place, plaintiff was standing on the scrap on the western end of the car.

When the car was about half emptied, with all of the scrap removed from the extreme eastern end of the car, plaintiff took up a position on the floor of the car with his back either against or in close proximity with the eastern endgate. While standing in this position giving signals to the crane operator, plaintiff felt the endgate start to move towards him. Being unable to hold up the heavy gate by himself, plaintiff tried to slow the fall so as to escape the trap, but he was able only to get most of his body out of the way, his heel being struck by the heavy gate which inflicted serious injuries upon him. He was not, however, pinned beneath the gate.

Just what made the endgate fall remains a complete mystery. It is undisputed that there were two latches to hold it up, and there is no evidence that either of these latches was defective. In fact, there is no evidence at all as to how the latches operated, how they were constructed or what their condition was either immediately before or immediately after the accident. Nor is there any evidence whether the latches were

fastened or unfastened prior to the accident or what their positions were after the endgate fell.

Plaintiff was unable to show any defective condition of the endgate, the latches or the car as was done in Court v. Pittsburgh & Lake Erie R. R. Co., 410 Pa. 520, where the bulging sides of the car offered a complete explanation why the latches of the endgate in that case did not perform their functions; nor did plaintiff offer any evidence to throw light on the problem whether, if one latch was unfastened or defective, the other latch could or could not hold the endgate in place. All that plaintiff was able to show about the car both before and after the accident was that there was a small piece of baling wire fastened through a hole in one side of the car which passed through a hole in one of the latches. He was unable to show that the wire interfered in any way with the latch in question, and it was admitted by his witnesses that the presence of wire on loads of scrap is not unusual, since such wire is frequently used to hold loads in place, etc.

The trial judge could find no basis under the evidence to justify a submission of the case to the jury, and we agree that no such basis existed. Neither of defendants had any reason to suspect the presence of a defect in the car, if indeed such defect actually existed* nor was there any evidence that such defect could have been discovered by a reasonable inspection. Any conclusion which the jury might have reached on the evidence would have been pure guesswork, and the guess would not even have been an educated one. If any negligence existed at all, it could have been the negligence of other employes of the scrapyard who had cus-

---

* The manager of the scrapyard testified for plaintiff that if there had been a defect in the car, he would have notified the railroad so it could make repairs before the car was returned to circulation. He testified that he noticed no such defect and did not ask that any repairs be made to the car before it left his yard.

tody of the car and who had moved it prior to the unloading operation. In fact, from the testimony given as to the manner of shifting the car by use of a magnetic crane attached to the endgate, it appears that it might easily have been this operation which dislodged the latches; further, it would seem that both latches had to be defective or not in operation in order for the gate to fall.

And now, February 19, 1965, the rule entered January 16, 1964, to show cause why the compulsory nonsuit entered in the case should not be removed is discharged.