Rennekamp, Appellant, *v.* Blair.

Argued October 9, 1953. Before STERN, C. J., STEARNE, JONES, BELL, CHIDSEY and ARNOLD, JJ.

*John E. Evans, Jr.*, with him *Evans, Ivory &
Evans*, for appellants.

*Joseph F. Weis*, with him *Thomas F. Weis* and *Sher-
riff, Lindsay, Weis & McGinnis*, for appellees.

OPINION BY MR. JUSTICE JONES, January 4, 1954:

This action was instituted in the Court of Common
Pleas of Allegheny County by the personal representa-
tives of James F. Swain, deceased, to recover damages
for his wrongful death in the crash, near Charleston,
West Virginia, of a private airplane in which he was
a guest passenger. The defendants were the owners of
the airplane and procured the pilot's services for
Swain's use of the plane on the trip that ended fatally.
The jury returned a verdict for the plaintiffs in the
sum of $10,000. The court en banc entered judgment
for the defendants n.o.v. and this appeal by the plain-
tiffs followed. The sole question involved is whether
the evidence adduced at trial was sufficient to support
a finding of causative negligence on the part of the
pilot.

The substantive rights of the parties are to be
governed by the *lex loci delicti*—in this instance the
law of West Virginia: *Randall v. Stager*, 355 Pa. 352,
49 A. 2d 689; Restatement, Conflict of Laws, §379.

Section 5474 of the West Virginia Code confers a right of action for wrongful death enforceable by the decedent's personal representative; section 5475 limits the damages recoverable in such an action to not more than $10,000. Negligence is adjudged in West Virginia, however, according to the principles of the common law, and, in the absence of evidence to the contrary, as here, it is to be presumed that the common law of West Virginia in relevant connection is the same as the law of the Pennsylvania forum: *General Motors Acceptance Corporation v. Foley,* 311 Pa. 477, 481, 166 A. 909; Restatement, Conflict of Laws, §622.

Viewing the evidence in the light most favorable to the verdict, the material facts may be summarized as follows.

Swain, a geologist in the employ of a Pittsburgh engineering firm, found it necessary to make a business trip to Dante, Virginia. Being well acquainted with the defendants, who were partners in the Meloby Company, he requested the use of their privately owned airplane for the trip. One of the partners arranged for him to be flown in the firm's plane with Sherman S. Houston acting as pilot. Houston, who was a professional flier, was employed as such by another company (Mellon-Stuart Construction Co.) but his services were ordinarily available to the partners of the Meloby Company. Swain was to be flown gratuitously.

With Houston and Swain aboard, the plane took off from the Allegheny County Airport and in due course arrived at Kanawha Airport near Charleston, West Virginia, where it was tied down for the night. Next morning the plane was refueled and engine oil added. At that time it was noted that oil was dripping from the nacelle (enclosing shelter or cover) of the *right* engine which condition was called to Houston's attention, but nothing was done about it at the time.

Shortly thereafter Houston and Swain left Kanawha Airport for Dante, Virginia, whence they returned the same day to the Kanawha Airport, arriving there between 6:30 and 7 P.M. The plane was refueled and about 7:09 P.M., with Houston and Swain again aboard, it took off from the Kanawha Airport for Pittsburgh. Approximately six minutes later and after having travelled some 20 to 25 miles, the plane crashed in the mountains of West Virginia and the wreckage caught fire. Both occupants were killed outright.

The plane was a twin engine Cessna and had been purchased by the defendants about three weeks before the crash. It had a carrying capacity of five persons (including the pilot) and was equipped with the devices ordinarily found on that type of aircraft. Twelve days before the fatal accident, the plane had been sent for its 100-hour inspection; and such repairs as the checkup indicated as necessary were made. The inspection was completed just four days before the plane's last flight, and its condition upon completion of the inspection was characterized by the mechanic as "excellent and air-worthy".

Houston was an experienced and skillful flier. He had a commercial pilot's license which allowed him to carry passengers for hire. It was estimated that he had had some 450 hours overall flying time, 20 to 40 hours of that time being night flying. He had flown the Cessna craft involved in the accident for about 20 hours. Swain was not a pilot and apparently had no flight experience other than as a passenger.

The only known person to have observed the plane after it left Kanawha Airport for Pittsburgh was a farmer named Edgar Skeen who owned a farm in the vicinity of the crash. He testified, by deposition, that he was sitting in his home when he heard a plane overhead which seemed to be in trouble. One engine was "a missing and a popping, making a funny sound".

He said "I just got up and went out on the porch as it [the plane] was making a circle coming around, and the light just shone in there, lit up everything as light as day, then came the crash and explosion, and the light from where he got on fire". Skeen identified the light, which he had seen while the plane was circling round, as coming from its landing lights. He said it was "just a very few seconds" from the time he first noticed the plane until he heard the crash.

The area surrounding the scene of the crash was hilly and wooded. There were few, if any, level tracts large enough or smooth enough to accommodate a plane for a landing. It was stipulated of record that the weather report for the day of the crash was ceiling 8000 feet, visibility 7 miles, clear. It was also agreed that the elevation of the Kanawha Airport was 985 feet and the site of the crash, 1100 feet above sea level. There was no testimony either as to the direction of the wind or its velocity.

The day following the crash two representatives of the Civil Aeronautics Administration arrived on the scene to investigate the wreckage. Their examination revealed that the impact had thrown the right engine 50 to 100 feet ahead and to the right of the body of the plane. The condition of the right propeller indicated that the right engine was developing power when the plane struck the ground. The left engine was still attached to the wreckage of the plane and badly burned. The quadrant (control apparatus) of the left engine, which had been fused by the fire following the crash, showed that the power of that engine had been cut off. The quadrant of the right engine had been set for low pitch, high RPM and throttle wide open. The plane's retractable landing-gear had been lowered.

The obvious import of this evidence, together with Skeen's testimony, is that during the plane's flight the left engine had failed and that the pilot had pre-

pared for a crash landing by turning on the landing lights, lowering the landing-gear and circling the area. It is to be noted that it was the *left* engine that failed so that the dripping of oil from the nacelle of the right engine prior to the take-off from Kanawha Airport for Dante was of no significance. In fact, the learned trial judge, without objection from the plaintiffs, withdrew that testimony from the jury's consideration as not being any evidence of causative negligence. Admittedly, it had nothing to do with the failure of the left engine which was the serious motor trouble.

The foregoing constitutes the whole of the plaintiffs' direct evidence which, of itself, is patently insufficient to warrant a jury's finding negligence on the part of the pilot. As we have frequently reiterated, negligence is not to be presumed. In other words, the mere happening of an accident is not evidence of negligence and is insufficient to take a case to the jury.

To round out their case, the plaintiffs called one George S. Heller, experienced in aviation, to testify as an expert. He had had extensive service as a pilot, flight instructor and as a flight examiner for the Civil Aeronautics Administration. In addition to his other flying experience, he had logged some 300 hours flying Cessna planes. But, he had no first hand knowledge of the conditions that confronted Houston when the engine trouble developed or as to what caused the plane to crash.

Heller testified that the proper flight altitude for a Cessna plane was about 3000 feet above sea level and that such a plane could climb (i.e., gain altitude) at the rate of 300 feet or better per minute. From that premise and the elapsed time from the take-off at the Kanawha Airport until the crash, he deduced that the plane was about 1900 feet above the terrain (i.e., 3000 feet above sea level) at the time the trouble in

the left engine developed. He also assumed that the right engine was functioning perfectly and was developing *full* power upon its contact with the ground although the only testimony in such regard was that it was developing power. He further testified that the right engine was capable of sustaining the plane on level flight with the left engine cut out, given favorable weather conditions and normal plane operation. He conceded, however, that a twin engine plane is likely to lose altitude when only one engine is operating and also that a plane may rise and drop rapidly over hilly country, such as the locus in quo, depending upon the wind velocity (here unknown) and the elevation of the plane. He also assumed that there were no other aerodynamic problems confronting the pilot at the time although he admitted on cross-examination that an airplane motor, like "anything mechanical", is "unpredictable" and "may go bad without notice."

On the basis of these assumptions, Heller gave it as his opinion that the proper aviation practice, when the plane's mechanical trouble developed in flight, was for the pilot to return to the Kanawha Airport for a landing there and that, not having done so, he was guilty of negligence which produced the crash and caused his own and his passenger's death. Save for the inference that, in the end, the pilot was apparently preparing for a crash landing in the vicinity, there was not a word of factual proof from which the jury could have found either directly or inferentially what Heller had assumed. Our statement in *Clark v. Pennsylvania Power and Light Company,* 336 Pa. 75, 79, 6 A. 2d 892, is peculiarly apposite, viz.,—"Plaintiff produced no evidence to substantiate such assumptions, with the result that any inference drawn therefrom by plaintiff's witnesses is worthless as evidence, and is at the most a mere guess or conjecture: *Lithgow v. Lithgow,* 334 Pa. 262; *Monahan v. Seeds &*

*Durham,* 336 Pa. 67." In the instant case, the learned trial judge aptly observed in his opinion for the court en banc upon entering judgment for the defendants n.o.v.,—"The difficulty with the case is that no one knows at what elevation the plane was flying when something untoward occurred nor just what the trouble was." As was said in *Hall v. Payne,* 189 Va. 140, 147, 52 S.E. 2d 76,—"To prove a possibility only, or to leave the issue to surmise or conjecture, is never sufficient to sustain a verdict."

The case of *Hall v. Payne,* supra, presents a factual situation quite similar to the present case. In the *Hall* case, the jury returned a verdict for the plaintiff-administratrix in an action for damages for the death of her decedent who was killed in an accident to a twin-seated airplane in which he was a guest passenger. The pilot was also killed and the suit, charging him with negligence, was instituted against the administrator of his estate. The jury returned a verdict for the plaintiff which, on the defendant's motion, the trial judge set aside and entered judgment for the defendant. Several witnesses saw the plane in the air just prior to and during its fatal plunge to the ground, but there was no direct testimony as to what had gone wrong with it. An expert witness for the plaintiff ". . . gave it as his opinion that the motor had power on when the plane struck, and that when the plane fell it was either in a stall (described as losing forward speed below the minimum required to keep in the air), or that the pilot was diving intentionally at the ground." The Supreme Court of Appeals of Virginia, in affirming the judgment for the defendant, said (p. 147),—"There is affirmative evidence that there was something wrong with the motor, but aside from that there is no fact proved from which a legitimate inference could be made that the crash was caused by any act of negligence on the part of [the

pilot]. Looking to the evidence and all proper inferences to be drawn from it, it is still a matter of conjecture as to what caused this unfortunate accident."

The pilot's duty to the passenger was to exercise ordinary care in the circumstances. By statute in this State the liability of an owner or pilot of an aircraft for injury or death to passengers carried is to be determined according to the law applicable to torts on the lands or waters of the Commonwealth arising out of similar relationships: Act of May 25, 1933, P.L. 1001, Sec. 406, 2 PS §1472. Swain was admittedly a guest in the plane and not a passenger for hire. Accordingly, the pilot, and by the same token his employers (for the purpose of this case the defendants were the pilot's employers), owed Swain the same degree of care that an owner or operator of a motor vehicle on land owes to a gratuitous passenger, that is, the care which a reasonably prudent man would exercise in the same or similar circumstances. Such is the rule generally. See *Bruce v. O'Neal Flying Service, Inc.,* 231 N.C. 181, 185, 56 S.E. 2d 560; *Hall v. Payne,* supra, p. 144; *Schumacher v. Swartz,* 68 D. & C. 3, 8; 6 American Jurisprudence, Aviation, §60; Rhyne, Aviation Accident Law, 57-58. There was no competent proof that the pilot failed at any time to exercise the care required of him. As the testimony of the plaintiffs' expert amounted to no more than a guess or conjecture, it was manifestly incapable of sustaining the plaintiffs' burden. Opinion evidence can have probative value, if at all, only where there is testimony sufficient to support findings by the jury of the facts assumed by the expert as the predicate of his opinion.

On the other hand, there is a presumption that the pilot exercised due care for his own safety. As Mr. Justice Maxey said in *Morin v. Kreidt,* 310 Pa. 90, 97, 164 A. 799,—"When a person is killed in an accident there is a presumption arising from the general knowl-

edge of the strength of the instinct of self-preservation and the natural desire to avoid pain and injury to oneself that the deceased at the time of the accident was exercising due care." In the absence of proof to the contrary, it must therefore be presumed that the pilot attempted to follow the correct procedure for one in his position. Furthermore, "His acts with regard to negligence must be judged from the circumstances as they then appeared. In his position one is not required to exercise . . . even an ordinary degree of judgment; it is a judgment arising from peril . . .": *Weiss v. Pittsburgh Railways Co.*, 301 Pa. 539, 543, 152 A. 674. Or, as otherwise stated in *Zurcher v. Pittsburgh Railways Company*, 353 Pa. 212, 216, 44 A. 2d 581,—"Nor was he responsible as a matter of law merely because of his possible errors or mistakes in trying to extricate himself from a position of danger which he had not created: see *Altomari v. Kruger*, 325 Pa. 235, 238-239, 188 A. 828, and the cases there reviewed." Mr. Justice STERN expressed the same idea in *West v. Morgan*, 345 Pa. 61, 63, 27 A. 2d 46, as follows: "A person is not responsible for an unwise choice of alternatives if quick decision is required to meet an emergency not created by antecedent negligence of his own."

What was said by Chief Judge HUTCHESON in *Chapman v. United States*, 194 F. 2d 974, 977 (5th Cir.), cert. denied 344 U.S. 821, is presently pertinent, —"The last critical moments of the flight . . . in a plane which, though still airborne, is in desperate plight, must, however, remain forever shrouded behind the impenetrable curtain which death has drawn. . . . [I]t is, *we think, fatal to plaintiffs' claim that they were unable to discharge their burden of proof by presenting evidence as to what in those critical moments was happening to and within the plane. . . .* Since we cannot know the facts, and conjecture may

not serve as proof of them the *post hoc* armchair speculations of the report, if admitted in evidence, may not serve as such."

Judgment affirmed.