Martin J. VIGDERMAN, Administrator of the Estate of Harold F. Fleming, Deceased

and

Philco Corporation

and

Globe Indemnity Company, in their own right and on behalf of Martin J. Vigderman, Administrator of the Estate of Harold F. Fleming, Deceased, and Emma L. Fleming

v.

UNITED STATES of America.

No. 21243.

United States District Court
E. D. Pennsylvania.
July 31, 1959.

Freedman, Landy & Lorry, Philadelphia, Pa. (Milton M. Borowsky, Philadelphia, Pa.), for plaintiff.

Richard Reifsnyder, Philadelphia, Pa., Asst. U. S. Atty., for defendant.

VAN DUSEN, District Judge.

The trial judge makes the following Findings of Fact:

1. On September 1, 1955, plaintiff's decedent, Harold F. Fleming, 38 years of age, was an employee of Philco Corporation and had been assigned by that corporation to perform services for the United States Air Force in Alaska, pursuant to the terms of a contract entered into by the United States Air Force and Philco Corporation.

2. On September 1, 1955, plaintiff's decedent, in the course of his employment, was one of seven passengers aboard a U.S.A.F. C–47 airplane, which departed at 1906 A.S.T. from the Air Force Base at Elmendorf, Alaska, with a crew of five, on a non-stop flight to Nome, Alaska. The flight was estimated to take three hours and twenty minutes and to cover 472 nautical miles.

3. At the time the aircraft departed, the weather conditions at Elmendorf Air Force Base were as follows: visibility 15 miles; scattered clouds at 4,500 feet; broken clouds at an estimated 9,000 feet; broken clouds at 20,000 feet; wind calm. The enroute weather forecast was favorable for a V.F.R. flight,[1] although instrument flight regulations were to be followed for training purposes. The aircraft was cleared for 11,000 feet on Amber Airway 1.

4. At the time the aircraft departed from Elmendorf Air Force Base, it was in good and safe operating condition. It carried 800 gallons of fuel, sufficient to keep it airborne for eight hours, and its gross weight was 26,450 pounds.

5. The aircraft was a two-engine aircraft manufactured by Douglas Aircraft Corporation, Model VC–47–D, Serial No. USAF 45893, and was accepted from the manufacturer during the fiscal year 1945.

6. The pilot and commander of the aircraft was Major Anthony W. Am Rhein, U.S.A.F. The co-pilot was Captain Robert C. Wilson, U.S.A.F. Major Am Rhein was fully qualified to command and pilot this type aircraft in accordance with the strict qualifications re-

1. A V.F.R. flight is a flight made under visual flight rules or regulations, as contrasted to a flight made under instrument flight rules or regulations.

quired by the Air Force in Alaska as of September 1, 1955.

7. At 1915 A.S.T., the aircraft reported over Susitna Intersection, its first check point, at 6,000 feet, climbing, and estimated Skwentna Radio Range at 1935 A.S.T. At 1933 A.S.T. the aircraft reported over Skwentna at 11,000 feet, estimating Puntilla Homing Beacon at 1940 A.S.T. At 1937 A.S.T., this last estimate was revised to 1950 A.S.T.

8. At 1955 A.S.T., when it was approximately 45 miles west of Skwentna at an altitude of 11,000 feet, the aircraft advised that, because of a backfire in its left engine, it was making a 180-degree turn and requested clearance back to Elmendorf Air Force Base. Anchorage ARTCC granted clearance and advised that the aircraft maintain 11,000 feet via Amber Airway No. 1. From this time on, the operator of the aircraft was confronted with a critical situation.

9. At 1956 A.S.T., the aircraft reported that it would maintain 11,000 feet to Skwentna but would take a lower altitude after passing Skwentna. Anchorage ARTCC issued new clearance to the aircraft to descend to and to maintain 5,000 feet after passing Skwentna.

10. At 2000 A.S.T., the aircraft advised that it was estimating Skwentna Radio Range Station at 2010 A.S.T. At 2009 A.S.T., this estimate was revised to 2015 A.S.T. At 2011 A.S.T., the aircraft advised Skwentna Radio Range Station that it was going to land at Skwentna Air Field. Anchorage ARTCC issued immediate clearance for this approach. The aircraft further advised that its radio signals were fading in and out, but it had the Skwentna Airport Beacon in sight. At 2017 A.S.T., the aircraft reported that it was making a straight in approach landing to the east.

11. At this time, it was twilight at Skwentna Air Field and the weather conditions were as follows: broken clouds at an estimated 12,000 feet; broken clouds at 18,000 feet; visibility 20 miles; barometric pressure 29.09; temperature 46° F.; dew point 45; wind calm.

12. There was no other aircraft in the traffic pattern or in the immediate vicinity of the airstrip, and no aircraft occupied any portion of the runway.

13. Skwentna Air Field is located between the Yentna and the Skwentna Rivers at a point near their junction and is approximately 65 miles from Elmendorf. On September 1, 1955, it had one hard-packed, gravel-surfaced runway, which ran approximately northwest by southeast and was 3,500 feet in length and 150 feet wide. Its navigational aids, which were in operation, consisted of a radio range, an SBRA2 range, air/ground; rotating beacon light; illuminated windsock; and range, obstruction, boundary threshold and runway lights. The airfield was not equipped with a control tower and had no crash equipment available. The surrounding terrain was rough, but not mountainous or hilly. The field was suitable for C–47 type aircraft.

14. At approximately one to one-and-a-half miles from the west end of the runway, the aircraft was at an altitude of approximately 300 feet, was properly aligned with the runway, and was making a normal, single-engine approach, with the left propeller in a feathered position and with landing gear down and flaps no more than one-half extended.

15. At approximately one-half to three-quarters of a mile from the west end of the runway, the operator of the aircraft initiated a go-around procedure, applying power to the right engine, which caused the plane to deviate momentarily from its course.

16. When the aircraft passed over the runway, it was at an altitude of approximately 75 feet. Landing gear and flaps were still down. Power was still being applied to the right engine. The aircraft passed over the runway without gaining altitude. Its gross weight at this time was less than 25,750 pounds.

17. After the aircraft passed over the runway, and at approximately one-quarter of a mile from the east end of the runway, it executed a left turn.

18. At approximately 300 yards to the north from the point of the turn, the aircraft crashed to the ground, killing all persons aboard, including plaintiff's decedent.

19. Upon impact, the aircraft was spun around to a southerly heading. The left propeller was still in a feathered position. The throttle controls for the left engine were in a full retarded position and the throttle controls for the right engine were in a full forward position. The right landing gear was fully retracted. The left landing gear was buried beneath the left engine nacelle. The flaps were extended approximately to a one-half position, the right and left wing flap sections having been forced to the retracted position.

20. An aircraft of the type involved here is capable, with only one engine operating, of maintaining altitude, climbing, turning, landing, and executing a go-around procedure. Final approach airspeed for a single-engine landing should be 10 m.p.h. faster than normal, or 110 m.p.h.

21. A turn of an aircraft reduces the lift and increases the possibility of a stall.

22. The operator of the aircraft involved here was not negligent in attempting to land at Skwentna Air Field, nor in failing to declare an emergency, nor in initiating a go-around procedure at approximately one-half to three-quarters of a mile west of the runway.

23. The operator of the aircraft was negligent in executing a left turn at approximately one-quarter of a mile beyond the east end of the runway while landing gear and flaps were extended.

24. This negligence of the operator of the aircraft was the proximate cause of the crash.

25. At the time of his death, plaintiff's decedent was receiving approximately $655.00 per month salary. In January of 1956, because of an overall wage adjustment and job reclassification by Philco Corporation, plaintiff's decedent would be receiving $582.00 per month salary. Decedent's wages were deposited in a joint bank account used by his wife at the rate of about $350.00 per month for food and upkeep of the house and he used less than $25.00 per week for his personal expenses.

26. At the time of the trial, plaintiff's decedent would have been 41 years of age with a life expectancy of 30.29 years.

27. Plaintiff's decedent was survived by his widow and only dependent, Emma Louise Harston (then known as Emma Louise Fleming).

28. Emma Louise Harston, as widow and survivor of plaintiff's decedent, received $2,838.39 as benefits under the Longshoremen's and Harborworkers' Compensation Act, 33 U.S.C.A. § 901 et seq. and the Defense Base Act, 42 U.S. C.A. § 1651 et seq., from Globe Indemnity Company, the insurer thereunder of decedent's employer, Philco Corporation.

29. Emma Louise Fleming remarried on August 19, 1956, and has been known as Emma Louise Harston since that date.

30. At the time of his death, plaintiff's decedent was not a resident of Philadelphia County, Pennsylvania.

31. On August 27, 1956, plaintiff Martin J. Vigderman was appointed administrator of the Estate of Harold F. Fleming by the Register of Wills of Philadelphia County, Pa.

## Discussion

 This is a suit for wrongful death resulting from an airplane accident brought against the United States under the Federal Tort Claims Act, 28 U.S.C.A. §§ 1346(b), 2671–2680. Since the accident and death in this case occurred in Alaska, the substantive rights and liabilities of the parties are governed by Alaska law and the rules governing burden of proof and burden of going forward with the evidence are determined by the law of the forum. 28 U.S.C.A. § 1346(b); Kendrick v. Piper Aircraft Corporation, 3 Cir., 1959, 265 F.2d 482; Knecht v. United States, 3 Cir., 1957, 242 F.2d 929. If the United States is to be held liable, therefore, it cannot be liable to plaintiff-administra-

tor in excess of $50,000., as provided by the law of Alaska in cases of death by wrongful act. 3 Alaska Comp.Laws Ann. § 61–7–3 (1955), as amended. Whether or not the United States is to be held liable is to be determined with reference to the common law, which has been specifically adopted in Alaska by statute. Alaska Comp.Laws Ann. § 2–1–2 (1949); see, also, Air Transport Associates v. United States, 9 Cir., 1955, 221 F.2d 467; Cherbonnier v. Rafalovich, D.C.D.Alaska 1950, 88 F.Supp. 900. However, since there is an absence of Alaska case law applicable to the questions involved, it will be presumed that the law to be applied will be that of the forum. Restatement, Conflicts, § 622.

A. *Liability*

The cases most pertinent to the facts of this case are Rennekamp v. Blair, 1954, 375 Pa. 620, 101 A.2d 669, and Chapman v. United States, 5 Cir., 1952, 194 F.2d 974. The Rennekamp case involved a crash of a twin-engine private plane in the mountains of West Virginia. In an attempt to prove his case, plaintiff produced a witness who testified that just before the crash he heard the plane overhead, noticed that one of the engines was missing, saw the plane make a circle, and then heard the crash and explosion. Plaintiff also introduced the results of an inspection of the wreckage by two members of the Civil Aeronautics Administration. The court concluded that this examination showed that the left engine of the plane had failed during the plane's flight and that the pilot had prepared for

a crash landing by turning on the landing lights, lowering the landing gear, and circling the area. This was all the evidence plaintiff produced concerning the pilot's negligence. Accordingly, the court affirmed the trial court's judgment n. o. v. for the defendant.

■ In the Chapman case, cited with approval in the Rennekamp case, a twin-engine military aircraft crashed in an attempt to make a forced landing at a commercial airport. With one engine out and the other missing, the pilot of this plane attempted to execute a left turn to come into proper alignment with one of the runways and began to lower the landing gear. At this point, the plane spun to the ground and crashed. There being no other evidence concerning the propriety in the way the pilot actually flew his plane, the court affirmed the lower court's finding of no negligence, saying 194 F.2d at page 977:

"Since knowledge must precede understanding, and understanding must precede judgment, and we cannot know, we cannot judge what was done by the pilot that he ought not to have done, what was left undone by him that he ought to have done, it is, *we think, fatal to plaintiffs' claim that they were unable to discharge their burden of proof by presenting evidence as to what in those critical moments was happening to and within the plane.*"

The proof in the present case, however, is more detailed.[2]

2. Plaintiff cannot rely on the doctrine of res ipsa loquitur. While the courts of Alaska have adopted this doctrine, its application has been limited to cases involving injury or death to a passenger caused by the negligence of a common carrier. Smith v. Pacific Alaska Airways, 9 Cir., 1937, 89 F.2d 253, wherein the court said that the applicable rule was stated in Gleeson v. Virginia Midland R. Co., 1891, 140 U.S. 435, 11 S. Ct. 859, 35 L.Ed. 458, which limits the rule to passenger cases; Haasman v. Pacific Alaska Air Express, D.C.D.Alaska 1951, 100 F.Supp. 1. This limitation on the application of the doctrine is also

recognized by the courts of Pennsylvania. Ambrose v. Western Maryland Rwy. Co., 1951, 368 Pa. 1, 81 A.2d 895; Sierocinski v. E. I. DuPont De Nemours & Co., 3 Cir., 1941, 118 F.2d 531, and cases there cited.

It must also be pointed out that negligence cannot be predicated on the decision to land at Skwentna, since proper Air Force procedure requires landing as soon as possible in the event of engine failure (N. T. 531) and it would be dark by the time the aircraft would have arrived at Elmendorf Air Force Base (N. T. 526). Similarly, negligence cannot be predicated on the failure to declare an

The investigation of this aircraft after the accident revealed that the right landing gear was fully retracted into the right engine nacelle, whereas the left landing gear was crumpled under the left engine nacelle. The investigation also revealed that the flaps were extended to approximately a one-half position (Statement of Capt. Arthur L. Cole, U.S.A.F., attached to Document No. 26). Therefore, at the time the plane hit the ground, the landing gear [3] and the flaps [4] were partially extended. At the time the turn was executed, approximately 300 yards south of the point of the crash, gear and flaps were partially extended. Even with a clean configuration, a turn of itself will increase the possibility of a stall (N.T. 592, 681). A turn made with gear and flaps extended increases this possibility even further (N.T. 582), and, as testified to by defendant's expert, would not be a proper and safe maneuver under such circumstances as existed here (N.T. 595).[5]

■ Considerable importance has been placed by the trial judge in the statement of Capt. Cole, who investigated the wreckage of this aircraft, since it contains the only evidence concerning the most crucial fact of this case—the posi-

tion of the landing gear and the flaps at the time the turn was executed and during the go-around. Better able to provide information of this fact would be Richard Gross and J. B. Whalen, both of whom observed the aircraft make its approach and pass over the runway. However, their statements (also attached to Document No. 26) contain no information concerning the position of the gear and flaps.[6] Particularly applicable to this situation is the rule that where a party (here, the United States) fails to produce witnesses within its control who presumably are best informed on the subject of investigation, especially if their relations with such party are not hostile but are friendly, so that their bias, if any, would be in such party's favor, it may be inferred that the information that would be provided would be unfavorable to such party. See Haas v. Kasnot, 1952, 371 Pa. 580, 92 A.2d 171; Wilkinson v. United Par. Serv., 1945, 158 Pa.Super. 22, 43 A.2d 408; Wills v. Hardcastle, 1902, 19 Pa.Super. 525. If it were not for this principle, the inferences upon which Findings of Fact 14 and 16 (with respect to the position of gear and flaps) and 23 are based would not be made by the trial judge.

emergency to Skwentna radio, since there was no crash equipment at the field (N. T. 514–5).

3. The landing gear on C–47 type aircraft, which is operated by the hydraulic system, do not retract simultaneously, since only one of the two hydraulic pumps operates to retract the gear at any one time (N. T. 693). In this case, since the right engine was the only engine operating, the hydraulic pump under that engine would be used to retract the gear. Therefore, as Capt. Cole found, the right gear would be retracted before the left gear.

The hydraulic system and the electrical system are separate systems in this aircraft (Flight Handbook for C–47, pp. 1–25 to 1–31; 3–23 to 3–26; 4–12 to 4–19). The trial judge, therefore, places little significance in the fact that the radio signals were fading in and out (see Finding of Fact 10).

4. Though one of defendant's experts apparently attempted to suggest that the im-

pact of the crash could have jarred the flaps to an extended position (N. T. 645), it is difficult to reconcile this explanation with the fact, as reported by Capt. Cole, that the flaps were forced upward upon impact from a one-half extended position. Furthermore, this witness spoke only of the effect of impact on the controls.

5. It is also to be noted that, since this aircraft executed a turn to the left toward its dead engine, it was more difficult for it to recover to a straight and level, or straight and climbing, flight attitude than if the turn had been to the right toward the operating engine (N. T. 591–2). Plaintiff's expert (N. T. 110–111) and one of defendant's experts (N. T. 595) do not think the turn to the left beyond the end of the runway was voluntarily executed by the operator of the aircraft.

6. The trial judge suggested after the trial concluded that counsel for the Government obtain more complete statements from these witnesses. See attached letters of January 12, 13, 14, and 15, 1959.

Applying this rule to this case, it may be inferred that the left turn was not executed by reason of any obstacle in the path of the aircraft at the point of the turn. It may also be inferred that the gear and flaps were extended [7] for the purpose of making a landing, at the time the go-around was initiated one-half to three-quarters of a mile from the runway (see Finding of Fact 15).[8] If such were the fact, the gear and the flaps, as stated above, would be retracting, but not fully retracted, at the time the aircraft crashed. The flaps would be extended to the one-half position, as is proper for single-engine landings [9] (see Flight Handbook for C-47, p. 3-5, Exhibit P-9).

Since this aircraft, at a normal, single-engine approach speed [10] will travel approximately 2880 feet during the time the landing gear is retracting (N.T. 643), it must be inferred, upon consideration of the length of the runway and the point of the crash, that the retraction of the gear was not begun until the plane was well down, if not beyond, the runway (N.T. 679). This delay in retracting the gear from the time the decision to go around was made was contrary to Air Force procedure (Flight Handbook for C-47, pp. 3-6, Exhibit P-9).

 While the ultimate cause of this accident can never be known, certain acts of negligence—namely, executing a

7. The defendant's answer to interrogatory 36 (Document No. 10 in Clerk's file) states that, as the aircraft passed over the field, its wheels were down and its flaps were partially extended. This answer would appear to be binding on defendant. The trial judge, however, feels that the case should be decided on the actual facts and gave the defendant every opportunity to produce testimony which the eye-witnesses could give on this point. See footnote 6. The stipulation (Document No. 26) concerning the statements of the eye-witnesses and the wreckage examiner must be read in light of these circumstances and the entire record.

8. The eye-witnesses testified that the go-around was initiated when the plane was approximately one-third down the runway (statements of Richard Gross and J. B. Whalen, attached to Document No. 26). If such were the fact, the operator of the aircraft would be negligent (N. T. 686-8). One of defendant's experts testified that a sudden increase in volume of the sound of the engine, apparently noticed by the two eye-witnesses, could indicate engine failure as well as the application of power (N. T. 598). The more logical inference to be drawn from the facts, however, is that since the noise level reaches its highest level as a plane passes over the observer (N. T. 653), power to the right engine was not first applied at a point one-third down the runway but was still being applied as the plane passed over the runway. Also, if power were first applied at this point, the observers would have noticed

the plane swerve momentarily from its course (N. T. 641).

9. The retracting of the gear and the raising of the flaps to proper go-around position are simultaneous acts under Air Force procedure for a single-engine go-around (N. T. 676). The flaps, however, will not operate until the landing gear is fully retracted (N. T. 642). Therefore, the position of the flaps at the time of the crash had not changed from the one-half (or less) position since the gear had not fully retracted.

10. A normal approach speed, it was testified, for single-engine landings is 110 m. p. h. (N. T. 639). The trial judge has not overlooked the possibility that the plane may not have been going 110 m. p. h. as it passed over the field, in view of the testimony that it was not gaining altitude. As stated in Finding of Fact 20, a C-47 can climb on one engine. Single-engine climb speed is 102 to 108 m. p. h. (Flight Handbook for C-47, pp. 3-6, Exhibit P-9). The rate of climb with gear and flaps extended, however, according to defendant's experts, is 150 to 100 feet per minute less than the rate of climb with a clean configuration (N. T. 594, 671). According to plaintiff's experts a C-47 cannot climb on one engine with gear and flaps extended (N. T. 112), but the trial judge disagrees with this contention. Any change in altitude would have been so slight that it would not have been noticed by the eye-witnesses. In any event, the slower the plane was traveling, the shorter distance it would travel while the landing gear retracted, and, therefore, the longer would have been the delay from initiating the go-around to retracting the gear.

turn with gear and flaps extended with only one engine operating and failing to retract gear and flaps upon deciding to go around—have been found. By reconstruction of the facts and by the testimony of defendant's experts, the trial judge concludes that the operator of this aircraft, though well trained and qualified to perform a single-engine go-around (see, also, N.T. 672), was not following the correct procedure for this maneuver at this particular time. This case is distinguishable from the Rennekamp and Chapman cases, for it can be judged "what was done by the pilot that he ought not to have done, what was left undone by him that he ought to have done." [194 F.2d 977.] From the facts found, a legitimate inference may be drawn that the crash was caused by the above-stated acts of negligence.[11] In Straight v. B. F. Goodrich Co., 1946, 354 Pa. 391, at page 396, 47 A.2d 605, at page 607, the court said:

" * * * it is not the rule that circumstantial evidence to establish negligence need exclude everything which the ingenuity of counsel may suggest as having possibly caused or contributed to the injuries or death: * * *. 'Since proof to a degree of absolute certainty is rarely attainable in any litigated factual controversy, the law requires only that the evidence as to the operative cause of the accident be enough to satisfy reasonable and well-balanced minds that it was one on which plaintiff relies.' (Citing cases.)"

See, also, Liguori v. City of Philadelphia, 1945, 351 Pa. 494, 498, 41 A.2d 563; Sweeney v. Bonacci, 3 Cir., 1949, 173 F.2d 541.

## B. Amount of Recovery

■ There is no serious dispute that if plaintiff-administrator is entitled to recover at all, he is entitled to recover $50,000, the maximum allowable under Alaska law. With decedent's life expectancy at the time of the trial being 30.29 years and his earnings at or around the time of his death being at least $582. per month, the actual damages suffered are well in excess of $50,000.

## C. Parties Entitled to Sue

■ Defendant does raise the question, however, of whether or not the four plaintiffs here are proper parties to this action. The Alaska Wrongful Death Act, 3 Alaska Comp.Laws Ann. § 61-7-3 (1955), states:

"When the death of a person is caused by the wrongful act or omission of another, the personal representatives of the former may maintain an action therefor against the latter, * * * the damages therein shall not exceed fifty thousand dollars, and the amount recovered, if any, shall be exclusively for the benefit of the decedent's husband or wife and children when he or she leaves a husband, wife or children, him or her surviving; * * *."

Decedent's widow and survivor, therefore, is not a proper party to this action. This result, however, is inconsequential from the widow's viewpoint, since the amount recovered would be for her exclusive benefit under the Act.

■ With respect to the right of the administrator to sue, defendant argues that plaintiff's decedent was not a resident of Philadelphia County and that the issuance to the administrator of letters of administration by the Register of Wills of Philadelphia County is null and void. See 20 P.S. § 320.301. The courts of Pennsylvania have held, however, that the granting of letters of administration by the Register of Wills is a

---

11. This case involves principles analogous to those stated in First National Bank of McKeesport v. Simko, 1956, 384 Pa. 603, 122 A.2d 47; Bisson v. John B. Kelly, Inc., 1934, 314 Pa. 99, at page 102, 170 A. 139, at page 140, wherein it was said:

"It is not a case of presuming negligence from the mere happening of an accident, but it is a case of inferring negligence from the circumstances from which the accident apparently arises."

judicial act which cannot be collaterally attacked. Zeigler v. Storey, 1908, 220 Pa. 471, 69 A. 894, 17 L.R.A.,N.S., 878; Snyder v. McGill, 1919, 265 Pa. 122, 108 A. 410; see, also, In re Freer's Estate, 1946, 353 Pa. 351, 45 A.2d 47; West v. Young, 1938, 332 Pa. 248, 2 A.2d 745; In re Estate of Brown, 1932, 105 Pa. Super. 236, 161 A. 471. The administrator, therefore, is a proper party to this action. However, for the protection of defendant, the widow will be required to approve personally the decree submitted by counsel for plaintiff in accordance with the Conclusions of Law stated below.

 The right to sue of Philco Corporation and of Globe Indemnity Company is governed by the case of United States v. Aetna Cas. & Surety Co., 1949, 338 U.S. 366, 70 S.Ct. 207, 94 L.Ed. 171. Under the rule of this case, as applied to these facts, Globe Indemnity Company is entitled to sue but Philco Corporation is not.

### Conclusions of Law

The trial judge makes the following Conclusions of Law:

1. The court has jurisdiction of the claims of Martin J. Vigderman, Administrator of the Estate of Harold F. Fleming, deceased, and of Globe Indemnity Company against the United States of America, and of the subject matter.

2. The court does not have jurisdiction of the claims of Emma Louise Harston (widow of the decedent) and Philco Corporation, inasmuch as they have no standing to sue in this action.

3. The decedent, Harold F. Fleming, lost his life in the crash of U.S.A.F. C-47, Serial No. 45893, in which he was a civilian passenger, at Skwentna Air Field, Alaska, on September 1, 1955, as a result of the negligent operation of the aircraft during the execution of a single-engine go-around procedure. The negligence of defendant was a substantial factor in causing the decedent's death.

4. The United States is liable for $50,000., the maximum amount recovera-ble under the Alaska Wrongful Death Act, which is to be distributed as follows:

To Martin J. Vigderman, Administrator $47,161.61
To Globe Indemnity Company 2,838.39

See 33 U.S.C.A. § 933, applicable here by reason of 42 U.S.C.A. § 1651 et seq.

All requests for Findings of Fact and Conclusions of Law which are inconsistent with the foregoing are denied.

Plaintiff's counsel may submit an appropriate decree containing the approval of the decedent's widow.