Sydney H. BLUMENTHAL, Administrator of the Estate of Donald W. Eastridge, Deceased, and Philco Corporation and Globe Indemnity Company, in their own right and on behalf of Sydney H. Blumenthal, Administrator of the Estate of Donald W. Eastridge, Deceased, and Marilyn A. Eastridge

v.

UNITED STATES of America.

No. 183 of 1956.

United States District Court E. D. Pennsylvania.

Dec. 5, 1960.

As Amended Dec. 9, 1960.

Milton M. Borowsky, Freedman, Landy & Lorry, Philadelphia, Pa., for plaintiff.

Walter E. Alessandroni, U. S. Atty., Philadelphia, Pa., Thomas P. Griesa, Admiralty and Shipping Section, Dept. of Justice, Washington, D. C., for defendant.

EGAN, District Judge.

The Court makes the following
Findings of Fact

1. On June 4, 1954, Donald W. Eastridge was an employee of the Philco Corporation, acting as a technical representative to the Air Force pursuant to a contract between the United States and Philco, which gave him access to military or commercial transport by air as required.

2. The accident which gave rise to this suit occurred on the return leg of a regularly scheduled Marine Corps flight from Itami, Japan to K–6, Korea and back, via K–8, Korea as a port of entry and departure (A. to I. 7; Ad. 12). The plane involved (Serial No. 126579) was a Fairchild R4Q–1, a two engine, twin

boom, high wing freight-passenger carrier (sometimes known as a flying boxcar), and was attached to Marine Transport Squadron VMR–253 based in Itami, Japan.

3. Decedent boarded the plane on June 4, 1954, at K–6, Korea, having been manifested as a passenger for this flight at the K–6 terminal (I–2). Prior to boarding the plane, decedent was provided with a parachute and a Mae West life preserver and the equipment required to be attached thereto, and decedent was instructed in the use of this gear (Williams 86–89). Decedent was under orders to visit radar detachments in Japan and Okinawa (Morris 6). The plane departed K–6 at 1225 local time and arrived at K–8 at 1255 (A. to I. 8). The plane departed K–8 at 1331 bound for Itami (A. to I. 8). The distance from K–8 to Itami is about 450 miles (A. to I. 73), normal flight time in an R4Q–1 being about two hours and ten minutes (L–4), so that the plane was due to arrive at Itami about 1540. The plane was on an Instrument Flight Rules flight plan, under the control of Taegu, Korea, with designated airways from K–8 to Itami.

4. At about 1434 while the plane was cruising at normal power setting at an altitude of 9,000 feet, in clear weather, all engine instruments reading normal (A. to I. 32), a sudden violent, inordinate vibration commenced which seemed as if it would shake the plane to pieces (Harris 185). At this time Major Badgley, the plane commander, was in the right seat and Major Maxwell, the co-pilot, was in the left seat. Sergeant Harris, the crew chief, was sitting on the left side of the cockpit behind Major Maxwell (Harris 185).

5. Upon commencement of the vibration, Major Badgley immediately feathered the right propeller. Meanwhile, Sergeant Harris had looked out to the left engine and yelled, "It's the left engine," and Major Maxwell immediately depressed the left feather button (Harris 186). The two feather buttons were pressed almost simultaneously (Harris 199) and almost immediately after the commencement of the vibration. The feathering of the left propeller was not delayed pending the results of feathering the right propeller.

6. The left engine came to a feathered position (Harris 198) and stopped turning for a short time, but the engine by this time was drooping from its anchorage so that the feathered blade position could not keep the blades from turning (Merritt 250–51). The left propeller commenced turning and the left engine and propeller fell off the plane (Harris 187).

7. In the meantime the pilot had brought the right engine and propeller back into operation (Ad. 16) and turned the plane back towards Korea (Williams 59). The pilot alerted the crew and passengers to prepare for possible bail-out (Harris 197; Williams 43), because the plane was losing altitude.

8. At approximately 2,000 feet, and about 10 minutes from shore (A. to I. 37, 86; Ad. 20), the bail-out commenced, with decedent going first (Williams 48). Decedent's parachute apparently opened promptly and he made a normal descent to the surface of the water. He was seen for a short time by Lieutenant Morris, a fellow passenger, being carried along the water by his parachute (Morris 14), but was not seen after that, and presumably drowned. There were 10 to 12 foot waves and winds of 25 to 30 knots at the place of the bail-out.

9. As the asserted tort was a maritime one, occurring more than a marine league from shore, the applicable remedy for the wrongful death is the Death on the High Seas Act, 46 U.S.C.A. § 761 et seq.

10. All of the eleven persons on board parachuted except Major Badgley, who tried to save the passengers and the plane and who apparently was still in the plane when it crashed. Six of the ten persons who parachuted where rescued and survived. Eastridge was not among the survivors.

11. Taegu Control obtained immediate information that the 6579 was in

distress 10 minutes SE of K–3, a base on the east coast of Korea, and this information was correct (L–9). Taegu immediately notified the Rescue Control Center of the Fifth Air Force. However, a mistake was made in transmitting the message to Rescue Control[1] so that incorrect information as to the identity and location of the 6579 was received (L–11). Correct information was supplied Rescue Control about an hour later and it took about 3 to 3½ hours to reach those who survived, during which time libellant's decedent had disappeared in the Sea of Japan. Respondent offers no reason or excuse for this conduct.

12. On June 4, 1954, aircraft 6579 was restricted to the carriage of freight only, and accepting passengers, particularly a civilian like Donald W. Eastridge, for transportation to Japan was in violation of this restriction. (Deposition of Joseph W. Williams, Jr., Major, U. S. Marine Corps Reserve, pp. 7, 8).

13. The R4Q–1 can operate successfully on a single engine, and if the left propeller had been successfully feathered and the left engine had remained in place, 6579 would have been capable of returning safely to K–3 (King 80, Merritt 251, 272).

14. The vibration which shook the left engine loose from its mountings was produced by a propeller imbalance not induced by any external force or the breaking of any of the propeller blades. Despite some evidence to the contrary, proper inspection, installation and maintenance of the left engine and propeller of 6579 would have prevented this malfunction and the ineffective feathering of the propeller on June 4, 1954.

15. The procurement, installation, maintenance and operation of 6579 was exclusively under the control of the respondent. The failure of the left propeller and loss of the left engine should not occur in the absence of negligence. Under the circumstances of this case, and particularly since the aircraft and libellant were lost in the Sea of Japan more than a nautical league off K–3 Korea, the libellant is entitled to the benefit of the doctrine of *res ipsa loquitur*. The failure of the respondent to explain satisfactorily the malfunction of the propeller and its failure to feather and the shaking loose of the left engine and its dropping into the sea leads to the conclusion that the respondent was negligent.

16. Donald W. Eastridge was born at Salem, Oregon, on June 8, 1927, and at the time of the occurrence was 27 years of age (Marilyn Eastridge Smith—hereafter "M.E.S." 4). He had served in the Navy and was honorably discharged on July 9, 1946 (Exhibit L–13). He was a graduate of Willamette University, having been awarded a degree Bachelor of Arts in June, 1950 (Exhibit L–14). In May 1951, he became engaged to Marilyn Archibald, born August 8, 1927, and in December 1951, they were married (M.E.S. 4, 9, 10). After their marriage he continued with post-graduate courses at Oregon State University in quest of a Master's degree (M.E.S. 11). His wife worked, and he earned money as a member of an orchestra on week-ends (M.E.S. 12). These earnings went into a joint savings account. In June 1953, he left college to accept a position with Philco Corporation (M.E.S. 17). They traveled to Philadelphia, Pennsylvania, where he took certain courses and practice instructions (M.E.S. 18), and in October 1953, he received orders from the Philco Corporation sending him overseas (M.E.S. 20). He was seven months on this assignment when he lost his life (M.E.S. 43). He had planned to make a career with the Philco Corporation (M.E.S. 30).

17. At the time of the trial, January 1960, he would have been 32 years of age with a life expectancy of 38.44 years (173). He enjoyed excellent health as did his widow (M.E.S. 28). At the time of his death he was earning a monthly

---

[1]. The message from Taegu to Rescue Control Center indicated that a single engined plane (a Banshee) was down 10 miles south of K–3 rather than a flying box-car about 10 miles southeast of K–3.

salary of $477.77, in addition to a living allowance (Graebe 159). His wages were sent directly to a joint bank account maintained by himself and his wife in Salem, Oregon (M.E.S. 23). As of January 1955, the salary of a technical representative was increased to $529 per month (Graebe 160). His rating record was very satisfactory (Graebe 160), and with his qualifications he would very likely have succeeded in achieving a position of senior engineer and project engineer (Graebe 161–162). The maximum salary for a project engineer at present is $1025 per month. It would have taken him at least ten years to achieve that position (Graebe 163). The minimum salary of a project engineer is $775 per month (Graebe 167). As a technical representative he was not fully utilizing his abilities (Graebe 168). There has been a shortage of qualified men for these positions, and it is likely he would have gone into one of these positions (Graebe 170, 171).

18. In the time that has elapsed since the fatal accident, the decedent would have earned in excess of $6,000 per annum, with the expectation that his earnings would have increased substantially in the future. Since his death, his widow has suffered a pecuniary loss by way of contributions. She will suffer a further loss in the future in the way of contributions and loss of inheritance.

19. The accident to libellant's decedent is such that in the absence of negligence in the care, inspection, maintenance and repair of the plane on the part of respondent, it probably would not have happened. Furness, Withy & Co. v. Carter, 9 Cir., 1960, 281 F.2d 264. Furthermore, respondent was negligent in its efforts to rescue the decedent. The neglect was that of Air Control at Taegu which radioed incorrect information to Rescue Control and to a lesser extent on the part of the latter in failing to check back, as it later did after the first attempt at rescue failed, to obtain correct information which belatedly resulted in the rescue of six men. United States v. Gavagan et al., 5 Cir., 1960, 280 F.2d 319.

20. The airplane at the time of the accident was under the exclusive and complete control of respondent.

21. Libellant's decedent was guilty of no conduct which could have contributed to the happening of the accident nor did he have any part in the functional performance of the airplane.

22. As to the first ground of negligence, the burden resting on libellant to prove negligence by a fair preponderance of the evidence has been satisfied by the inference embodied in the *res ipsa loquitur* rule, in addition to the evidence that the plane was to carry no passengers, which we have construed to mean. *civilian passengers.* The second ground of negligence is established by a fair preponderance of the evidence in that critical mistakes were made ashore by the Government's agents in their failure to pass on and evaluate vital information which could and probably would have resulted in a rescue of those adrift at sea.

23. The respondent's evidence was not of sufficient force to overcome libellant's evidence which, as we have stated, established negligence on the part of respondent by a fair preponderance of the evidence.

24. Libellant's decedent was survived by his widow and only dependent, Marilyn A. Eastridge, who has remarried on January 20, 1957 and is now known as Marilyn A. Eastridge Smith.

25. On May 14, 1956 Sydney H. Blumenthal, the libellant, was appointed administrator of the Estate of Donald W. Eastridge, by the Register of Wills of Philadelphia County, Pennsylvania, and the administrator is a proper party to this action and the suit is properly brought in the Eastern District of Pennsylvania. Vigderman v. United States, D.C., 175 F.Supp. 802, 810, 811.

26. Marilyn A. Eastridge, as widow and survivor of libellant's decedent, received $4434.34 as benefits under the Longshoremen's Compensation Act, 33 U.S.C.A. § 901 et seq. and the Defense Bases Act, 42 U.S.C.A. § 1651 et seq. from Globe Indemnity Company, the in-

surer thereunder of decedent's employer, Philco Corporation. (Testimony S. H. Blumenthal, pp. 177–181).

27. Globe Indemnity Company is entitled to sue but Philco Corporation is not, under the authority of United States v. Aetna Casualty & Surety Co., 1949, 338 U.S. 366, 70 S.Ct. 207, 94 L.Ed. 171; Vigderman v. United States, supra.

28. The Court finds for the libellant and against the respondent in the sum stated in the Conclusions of Law.

## Conclusions of Law

1. The Court has jurisdiction over the parties and the subject matter by virtue of the provisions of the Death on the High Seas Act, 46 U.S.C.A. § 761 et seq., and the Defense Bases Act, 42 U.S.C.A. § 1651 et seq.

2. The decedent, Donald W. Eastridge, lost his life on June 4, 1954, by drowning after he was compelled to bail out of a United States Marine Corps Transport R4Q–1 aircraft, bureau number 126579, in which he was a civilian passenger, shortly before it crashed into the Sea of Japan more than a nautical league off the west coast of Korea as a result of the negligence of respondent. The negligence of respondent was a substantial factor in causing the decedent's death. The decedent was not contributorily negligent.

3. Sydney H. Blumenthal, as Administrator of the Estate of Donald W. Eastridge, is awarded the sum of $75,000, of which sum the proctors for libellant are awarded 20%, plus reimbursement of costs. Of the net sum remaining, the sum of $4434.34 shall be payable to Globe Indemnity Company by way of subrogation.

4. This Court does not have jurisdiction of the claims of Marilyn A. Eastridge, now Marilyn A. Eastridge Smith, (widow of decedent), and Philco Corporation, inasmuch as they have no standing to sue in this action.

## Discussion

This case differs essentially from Vigderman v. United States, D.C.1959, 175 F.Supp. 802, supra, so ably disposed of by my colleague, Judge Van Dusen.

By a curious coincidence, that was a suit to recover, under the Federal Tort Claims Act, for the death of another Philco employee who had been attached to the Air Force, resulting from an airplane accident occurring in Alaska. It was held that the substantive rights and liabilities of the parties were governed by Alaska law where the accident and death occurred, and that the rules governing burden of proof and burden of going forward with the evidence were determined by the law of the forum. The Court said that the *res ipsa loquitur* rule could not be applied in that case even though it was permitted by Alaska law because its application had been limited to common carrier cases involving injury or death to a passenger.

Here the accident and death happened over and in the Sea of Japan, in international waters, between Korea and Japan while libellant's decedent was a passenger in a military plane. It has been brought on the admiralty side of the Court under the Death on the High Seas Act, 46 U.S.C.A. § 761 et seq., and is governed as to practice and procedure by the admiralty rules. It is that body of adjective law that constitutes the law of the forum as applied to the case at bar. Kunkel v. United States, D.C.S.D. Cal.1956, 140 F.Supp. 591, 594, 595. For a specific authority relating it to the crash of a plane at sea, the parties are referred to Trihey v. Transocean Air Lines, 9 Cir., 1958, 255 F.2d 824, 830. There can be no question that the case falls clearly within the admiralty jurisdiction. The Plymouth, 1865, 3 Wall. 20, 70 U.S. 20, 18 L.Ed. 125.

The doctrine of *res ipsa loquitur* is applied both substantively and as a matter of procedure in admiralty. See Austerberry v. United States, 6 Cir., 1948, 169 F.2d 583, and cases cited at page 591 thereof. See also Johnson v. United States, 333 U.S. 46, at pages 49, 50, 68 S.Ct. 391, at page 393, 92 L.Ed. 468; Goodwin v. United States, D.C.E.D. N.C.1956, 141 F.Supp. 445, 446, where it

was applied to the loss of a fishing vessel by a Marine Corps aircraft bomb under the Federal Tort Claims Act; and Hill v. Atlantic Navigation Co., 4 Cir., 1955, 218 F.2d 654, 656.

■ The Death on the High Seas Act, 46 U.S.C.A. § 761 et seq. was passed by Congress in 1920 in order to fill a void in the existing law of admiralty. No right to recover for wrongful death existed in the general maritime law as was also the case under the common law prior to Lord Campbell's Act. The courts enforced state death statutes in accidents occurring on territorial waters, Sherlock v. Alling, 1876, 93 U.S. 99, 23 L.Ed. 819, and resorted to various devices, such as the law of the home port, in an attempt to extend the right to death on the high seas. This was permitted so long as it did not conflict with federal legislation. The Hamilton, 1907, 207 U.S. 398, 28 S.Ct. 133, 52 L.Ed. 264. The Death on the High Seas Act was to end conflicts by establishing a uniform right of action pre-empting state jurisdiction (50 Cong. Rec. 4485). The Act, when applicable, gives an exclusive right to sue in admiralty and pre-empts any right to sue in a civil court.

■ In the same manner as a private person is liable under the Death on the High Seas Act, so, too, is the Government under the Federal Tort Claims Act: Moran v. United States, D.C.D.Conn. 1951, 102 F.Supp. 275, 279 (detonation of aerial bombs damaging fishing nets on the high seas). In Kunkel v. United States, D.C.S.D.Cal.1956, 140 F.Supp. 591, 594, at page 595 (cameraman gratuitously transported on a Naval helicopter) the Court stated:

"Since the Government has consented to be sued and to be liable only 'under circumstances where * * * a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred' 28 U.S.C. §§ 1346(b), 2674, and 'the place' is the high seas, and 'the law' is the Death on the High Seas Act giving an actionable claim only 'in admiralty' * * *."

By referring to "the law" as the "Death on the High Seas Act" the Court meant the traditional tort law of the ship's flag: The Titanic, 1914, 233 U.S. 718, 732, 34 S.Ct. 754, 755, 58 L.Ed. 1171; Restatement of Conflicts of Law, § 406; The City of Rome, D.C.S.D.N.Y. 1930, 48 F.2d 333; Lauritzen v. Larsen, 345 U.S. 571, 584, 585, 73 S.Ct. 921, 97 L.Ed. 1254.

■ It is clear, therefore, that the instant case falls within the Government's waiver of sovereign immunity under the Federal Tort Claims Act, and that it is a maritime tort under the Death on the High Seas Act and not a tort arising in a foreign country as contended by the Government.

■ The Act has been held to apply to aircraft as well as to surface craft, D'Aleman v. Pan American World Airways, 2 Cir., 1958, 259 F.2d 493, 495:

"The purpose of the Act was to create a uniform cause of action where none existed before and which arose beyond the territorial limits of the United States or any State thereof. When the Act was passed (March 30, 1920) the only feasible way to be carried beyond the jurisdiction of any law applicable to wrongful death was by ship. However with the development of the transoceanic airship the same extraterritorial situation was made possible in the air. The Act was designed to create a cause of action in an area not theretofore under the jurisdiction of any court. The means of transportation into the area is of no importance. The statutory expression 'on the high seas' should be capable of expansion to, under, or, over, as scientific advances change the methods of travel. The law would indeed be static if a passenger on a ship were protected by the Act and another passenger in the identical location three thousand feet above in a plane were not. Nor should the

plane have to crash into the sea to bring the death within the Act any more than a ship should have to sink as a pre-requisite."

The liability of the United States and its consent to be sued is fixed by Section 2674 of the Federal Tort Claims Act (28 U.S.C.) which provides:

"The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages. * * *"

Jurisdiction of the district court is prescribed by Section 1346(b) of the same Act, which reads, in pertinent part:

"* * * the district courts * * * shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages * * * for * * * personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government * * *, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."

Venue is fixed by Section 1402(b) of the same Act which says:

"Any civil action on a tort claim against the United States under subsection (b) of section 1346 of this title may be prosecuted only in the judicial district where the plaintiff resides or wherein the act or omission complained of occurred."

By Section 2680 of the Act there are excepted from recovery under the Act claims or suits in admiralty against the United States covered by Death on the High Seas Act, as follows:

"The provisions of this chapter and section 1346(b) of this title shall not apply to—
\* \* \* \* \* \*

"(d) Any claim for which a remedy is provided by sections 741–752, 781–790 of Title 46, relating to claims or suits in admiralty against the United States. [Note: Death on the High Seas Act is 46 U.S.C. §§ 761–68.]
\* \* \* \* \*

"(k) Any claim arising in a foreign country."

The right of action and where, and by whom, it may be brought is covered by Section 761 of Title 46 U.S.C.A. (Death on the High Seas Act) which says:

"Whenever the death of a person shall be caused by wrongful act, neglect, or default occurring on the high seas beyond a marine league from the shore of any State, or the District of Columbia, * * * the personal representative of the decedent may maintain a suit for damages in the district courts of the United States, in admiralty, for the exclusive benefit of the decedent's wife, husband, parent, child, or dependent relative against the vessel, person, or corporation which would have been liable if death had not ensued."

In such case the amount and apportionment of any recovery is covered by Section 762 of the same Act which provides:

"The recovery in such suit shall be a fair and just compensation for the pecuniary loss sustained by the persons for whose benefit the suit is brought and shall be apportioned among them by the court in proportion to the loss they may severally have suffered by reason of the death \* \* \*."

By Section 2678 of Title 28 U.S.C., the Court may allow attorneys' fees not to exceed 20%.

■ The application of the doctrine of *res ipsa loquitur* does not preclude libellant's proof of specific negligent acts and omissions. It is now well settled that in pursuing alternate theories of liability

the libellants do not prejudice their reliance upon the doctrine of *res ipsa loquitur*. Weigand v. Pennsylvania Railroad Co., 3 Cir., 1959, 267 F.2d 281; Citrola v. Eastern Airlines, Inc., 2 Cir., 1951, 264 F.2d 815, 818; Northwest Airlines v. Rowe, 8 Cir., 1955, 226 F.2d 365, 370; Haasman v. Pacific Air Express, D.C.Alaska 1951, 100 F.Supp. 1, 2, affirmed sub nom Des Marais v. Beckman, 9 Cir., 1952, 198 F.2d 550, certiorari denied 1953, 334 U.S. 922, 73 S.Ct. 388, 97 L.Ed. 710; Prosser Torts, 214 (2d ed. 1955), 33 A.L.R.2d 791.

Plane 6579 was restricted to the carriage of freight only and should not have been used to carry the libellant's decedent in an extended flight over water.

Major Williams was one of the survivors. He was a former member of the squadron. He organized and supervised the bail-out (Morris 12, 21). He passed over early rescue in favor of some of the other survivors without a life raft (Williams 60). He was in the Marine Corps Reserve (Williams 99–100) at the time he gave his deposition. Major Williams stated without reservation that 6579 was restricted to carrying freight only (Williams 8). He was the officer who took over the controls at Itami on the first leg of the flight and would have reason to be more keenly aware of the aircraft's status than the others. He showed his awareness of that status when Captain Bernasco sought to hitch a ride to Itami (Williams 26). He made it clear that carrying Captain Bernasco as a "special crew member" was a subterfuge (Williams 114). Regardless and making no finding as to the military, we conclude that it was improper for Eastridge, a civilian, to have been aboard as a passenger under the circumstances. (Williams 123).

█ Major Maxwell also was aboard the plane as a member of its crew, yet the Government did not produce him as a witness and did not take his deposition for use at the trial. The reason given was that the Government learned that he was ill. However, before the trial started, the Government did not ask for the postponement of the trial or for its adjournment until he was available. Under such circumstances, it must be concluded that his testimony would have been favorable to the libellant and adverse to respondent. Vigderman v. United States, supra.

No act of God is present in this case to account for the sudden malfunction of the left propeller and the detaching and dropping of the left motor into the sea. The Government has failed to explain satisfactorily the nature of the failure or its cause. The malfunction is one which does not normally occur in an aircraft without negligence. Moreover, in this case, the libellant had no opportunity to obtain specific information pertaining to the engine and propeller despite repeated attempts to elicit such information. The Government steadfastly maintained such information kept in operational and maintenance records, including engine and propeller logs, was not available because these records had been destroyed. This, despite the fact that the instant suit was brought within the statutory limitation period and an investigation had been made by the commanding officer of the squadron the following day (A. to I. 12). It is customary to incorporate pertinent logs in such investigations (Nault 338–339; Morse 344–345).

It was not until the libellant had completed the direct examination of the expert witness that the Government amended its answer to interrogatory 84 to include the data in a report of the Hamilton Standard Propeller Company relating to the service time of the engines and propellers of 6579 (148, 325).

█ In the light of the service time of the left propeller, the respondent seeks to shift the blame of the malfunction to the manufacturer. The disclosure is made for the first time five and one-half years after the occurrence; the libellant has been deprived of any discovery indicated by such disclosure; the libellant has been prevented from joining the manufacturer as a party-respondent; the use of such evidence to libellant's prejudice

violates the letter and spirit of the rules of discovery. See O'Connor v. United States, 2 Cir., 1958, 251 F.2d 939.

We now come to the question of damages. The established rule is that the widow's rights are fixed as of the moment of death, and her subsequent remarriage is not to be considered in assessing damages. Johns v. Baltimore & Ohio Railroad Company, D.C.W.D.Pa. 1956, 143 F.Supp. 15, 28, affirmed per curiam 3 Cir., 239 F.2d 385; Vigderman v. United States, D.C.E.D.Pa.1959, 175 F.Supp. 802; United States v. The S.S. Washington, D.C.E.D.Va.1959, 172 F. Supp. 905, 908, affirmed sub nomine United States v. Texas Co., 4 Cir., 272 F.2d 711; The City of Rome, D.C.S.D.N.Y. 1930, 48 F.2d 333. She is entitled to receive under the Death on the High Seas Act, 46 U.S.C.A. §§ 761, 762, a fair and just compensation for the pecuniary loss she has suffered by reason of the death of the libellant's decedent. This includes not only loss of contributions but also the loss of inheritance. National Airlines, Inc. v. Stiles, 5 Cir., 1959, 268 F.2d 400, 403–404, certiorari denied 361 U.S. 885, 80 S.Ct. 157, 4 L.Ed.2d 121. We fix such compensation at $75,000 (less reimbursement to libellant Globe Indemnity Company for compensation paid to the widow as shown in finding of fact No. 26).

We have examined the Government's arguments and the authorities cited in support thereof and we find that they lack validity. Thus this was a tort arising on the high seas more than a nautical league from shore and not within the territorial limits of a foreign country; and the Government was not a mere volunteer in the search and rescue operations and its negligence in connection therewith rendered it liable. United States v. Gavagan et al., 5 Cir., 1960, 280 F.2d 319. This is not a case where negligence results from a mere failure to rescue. On the contrary, it is one where the inaction and the mistaken action of the Government worsened libellant's decedent's position. Compare P. Dougherty Co. v. United States, 3 Cir., 1953, 207

F.2d 626, certiorari denied 347 U.S. 912, 74 S.Ct. 476, 98 L.Ed. 1068; Rayonier, Inc. v. United States, 1957, 352 U.S. 315, 77 S.Ct. 374, 1 L.Ed.2d 354; Frank v. United States, 3 Cir., 1957, 250 F.2d 178, certiorari denied 356 U.S. 962, 78 S.Ct. 1000, 2 L.Ed.2d 1069.

All requests for findings of fact and conclusions of law which are inconsistent with the foregoing are denied.

Libellant's counsel may submit an appropriate decree.